BELLINGHAM COLD STORAGE COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9144–72.    Filed April 16, 1975.

*James D. Rolfe,* for the petitioner.
*Thomas N. Tomashek,* for the respondent.

HALL, *Judge:* Respondent determined the following deficiencies:

| TYE June 30— | Deficiency |
|---|---|
| 1969 | $25,436 |
| 1970 | 43,254 |
| 1971 | 41,256 |

Concessions having been made by the parties, the only question that remains is whether rental payments made by the petitioner during the years at issue were partly for future use and occupancy of leased improvements. Petitioner claims the entire rental payments are deductible currently, whereas respondent claims that a portion thereof must be amortized over the term of the lease.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner Bellingham Cold Storage Co. was incorporated in the State of Washington in 1945. Since its incorporation petitioner has operated a cold storage business for agricultural and fish products on filled land at Squalicum Waterway, Bellingham, Wash. Bellingham was petitioner's principal place of business when it filed its petition. Petitioner filed its corporate income tax returns for the taxable years ended June 30, 1969, 1970, and 1971 with the District Director of Internal Revenue in Seattle, Wash.

The Port of Bellingham (Port) is a port district organized under the laws of the State of Washington. The Port is governed by a commission consisting of three members elected from within the geographic area of the port district. The commission establishes policies for the Port and administers its operations. All Port contracts are subject to the commission's approval.

Under State law the Port is empowered to develop waterfront property for use by industry.

*Leases Preceding Leases in Issue*

Petitioner leased its original tract of land from the Port in 1945. It consisted of approximately 4½ acres of unimproved waterfront property at Squalicum Fill. In 1945, petitioner constructed its first improvements, the two original warehouses and the Stokely Building. From 1945 through 1959 petitioner rented additional land from the Port and its rent per acre increased. During this period petitioner invested approximately $1 million of its own funds for additional improvements consisting primarily of the addition of a warehouse (warehouse 3) and renovation of the Stokely Building.

In 1957 the commission hired an engineering firm to do a comprehensive study and create a master plan for long range development of the port district. The results, published in 1958, included recommendations for industrial development. The report suggested expansion of the Squalicum Harbor and Squalicum Fill area to provide moorage for fishing boats in anticipation of extensive fishing industry growth. The report also recommended development of a fish-processing area and cold storage facilities. At that time there were no docking and cold storage warehouse facilities, and fish-processing facilities were negligible.

By the end of 1958 petitioner sought again to expand its facilities because of increased business. However, it was not able to obtain financing for a new warehouse because its net worth was less than $60,000. Petitioner therefore entered into negotiations with the Port for financing. The Port was interested in encouraging waterfront construction to promote development according to its master plan.

After extended negotiations between the Port commissioners and petitioner, the Port in 1959 agreed to construct a fish-receiving and -processing building and warehouses 4 and 5 on land in Squalicum Fill and lease them to petitioner. The improvements were to be financed by revenue bonds issued by the Port and sold to the public through a municipal underwriting firm. Prior to signing the lease, the Port sought assistance from its bond counsel to insure the legality of the transaction. The Port also sought assistance from its financial adviser to secure an ac-

curate assessment of its financial condition and to insure that petitioner's potential rental payments were large enough to fund retirement of the bonds.[1] Public hearings were held, and thereafter the bond resolution was submitted for approval to the Port commissioners.

The parties executed a lease dated November 10, 1959, covering the newly constructed fish-receiving and -processing building and warehouses 4 and 5. It also incorporated the land covered under the 1945 lease. The new lease provided for a $24,000-per-year rental for a 50-year term. While the engineering firm in its proposed master plan had suggested a lease formula based on real estate values, the rent charged under this lease was not based on appraised land values; instead the rent was based on the amount of revenue the Port needed to retire the bonds it issued to fund the improvement. Leases subsequently negotiated between the parties for additional improved realty were also geared to the amount of money needed to retire bonds issued to fund the improvements built by the Port.

As petitioner's business improved, it needed additional facilities. The Port also wanted expansion which would improve the local job market and complete its master plan for development. The parties entered into negotiations in 1962 to add a warehouse for fruits and vegetables. A new bond issue was needed to fund the improvements. The same bond issue procedures used in 1959 were used here. Those procedures were also used for later bond issues to fund the additional improvements noted below.

The negotiations resulted in an agreement in 1962 whereby the Port would construct warehouse 6 on 1 acre of property and lease it to petitioner for a period of 50 years. The lease was dated February 15, 1962. Petitioner agreed to pay $2,325 rent per month ($27,900 per year) for the first 25 years of the lease, and then renegotiate the rent for the last 25 years of the lease, provided the renegotiated rent was not to be in excess of $1,000 per month ($12,000 per year).

By October 1962 petitioner was again negotiating with the Port for construction of an additional warehouse. However, before the Port would agree to construct and lease a new warehouse, it sought to consolidate the earlier 1959 and 1962

[1] In the bond issue to fund the 1959 improvements only, the Port advanced some of its own money to supplement rental payments received from petitioner.

leases and required a provision that rent under those leases would be renegotiated in 1987 based on land values at that date. The Port realized that petitioner's business was improving, and it felt it would be in its own best interests to have a flexible rent. Such a consolidated lease was executed on October 5, 1962. It provided for a $4,400 monthly rent ($52,800 per year), $75 a month more than the combined rent on the earlier leases, for the first 25 years of the lease, and a renegotiated rent not to exceed average ground rent charged other Port tenants at the time of renegotiation for the remaining 25 years.

The Port thereafter agreed to build warehouse 7 on 1.15 acres and lease it to petitioner. The parties executed the lease for the warehouse on January 22, 1963. The lease was for 50 years beginning February 15, 1963. Petitioner was to pay $2,800 rent per month ($33,600 per year) for the first 20 years, and thereafter the parties were to renegotiate the rental, which was not to exceed the average ground rental charged other Port tenants at the time of renegotiation.

### Leases in Issue

On August 11, 1964, the parties executed a new lease which superseded and consolidated all earlier leases. This lease was for 50 years from May 1, 1964. It covered 12.75 acres, which included land that had been leased earlier plus an additional 3.9 acres for a dock and marine fuel facility. Petitioner was to pay rent of $7,900 per month through August 31, 1965, and then $7,500 per month through January 31, 1983.[2] The rent was then to be reduced to $4,750 per month through March 30, 1987. The rent for the remaining 27 years and 1 month was to be renegotiated, but was not to exceed the average ground rent charged other Port tenants at the time the rent was renegotiated. The consolidated lease further provided that if improvements were destroyed and neither party exercised its option to rebuild the improvements, the annual rent would be reduced to $900 per acre.

------

[2] The $7,900 per month through Aug. 31, 1965, and the $7,500 per month through Jan. 31, 1983, included $700 per month and then $300 per month over the combined monthly totals of the earlier leases as compensation for docks built by the Port which were not funded with a bond issue. By the time of trial, petitioner was paying a monthly payment of $7,125 because improvements financed from the Port's general fund had been paid off and petitioner was no longer using a marine fuel facility.

In 1967 the parties entered into new negotiations for the Port to construct and lease warehouse 8. Petitioner had shortly before secured outside financing to construct a vegetable processing and repack facility, and was unable to obtain additional outside financing for the new warehouse. The parties executed a lease on February 14, 1967, covering a 1.96 tract on which warehouse 8 was located. The lease was for a term of 46 years and 11 months, beginning June 1, 1967; the expiration coincided with termination of the other lease. The Port, based on advice of its financial adviser, required a different rental formula for this lease. The overall view of the commission had changed. The Port-constructed improvements had helped strengthen the area's economic base, and the commission was looking ahead to the period when the bonds would be retired and it would be able to charge petitioner rent based on land values. Petitioner had been successful and was now in a stronger financial position. The Port therefore felt it could charge petitioner more rent though it was still not based on land values. Accordingly, petitioner agreed to pay $4,500 rent per month ($54,000 per year) through May 1997 or until the revenue bond issue for warehouse 8 had been retired or until sufficient funds had been paid into the bond-redemption account to redeem and retire the bonds, whichever came first. At that point petitioner was to pay a negotiated ground rent in no event more than the average ground rent the Port charged other tenants at that time, and in addition a negotiated rent for the improvements not to exceed 5 percent of the depreciated cost averaged over the succeeding 5 years. The rent on improvements was to be renegotiated every 5 years until expiration of the lease. As with the 1964 lease, this lease also provided that if the improvements were destroyed and neither party exercised the option to rebuild them, the annual rent would be reduced to $900 per acre.

All leases negotiated were based on rentals for the current use and occupancy of the leased premises. Income tax consequences were not considered in negotiating these leases. Except as noted above, the lease provisions and the parties' accounting practices did not segregate the amount of rent paid between land and improvements.

The waterfront property that petitioner leased from the Port has continued to appreciate in value since 1959. In 1959 it had a market value of $10,000 per acre, in 1964 a value of $17,500 per

acre, and in 1974 a $37,500-per-acre value. The Port presently uses a value of $35,000 per acre for unimproved land, and charges rent equal to 9 percent of that value less any leasehold property taxes paid by the tenant.

OPINION

Petitioner contends that the total annual rent paid in the years in issue was required to be paid for the current use and occupancy of the improved real property leased from the Port, and therefore was deductible in its entirety under section 162(a)(3).[3] Section 162(a)(3) provides in part:

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—
    * * *
    (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

Respondent argues that portions of the amounts paid were advance rent for the future use of the improvements constructed by the Port, and that an allocable part of the total rent should be spread over the life of the leases.

The question of whether rent paid is for the current use and occupancy of improved realty or for future use is a question of fact to be determined in light of all facts and circumstances surrounding the payments. *University Properties, Inc. v. Commissioner*, 378 F. 2d 83 (9th Cir. 1967), affg. 45 T.C. 416 (1966); *Southwestern Hotel Co. v. United States*, 115 F. 2d 686 (5th Cir. 1940), cert. denied 312 U.S. 703 (1941); *Oscar L. Thomas*, 31 T.C. 1009 (1959); *Southern Ford Tractor Corporation*, 29 T.C. 833 (1958). Rents are deductible only for the year in which they are a current cost. Advance rent, paid for the use and occupancy of the property beyond the present year, is not currently deductible, but instead must be apportioned over the period to which properly attributable, often the life of the lease. *Main & McKinney Bldg. Co. v. Commissioner*, 113 F. 2d 81 (5th Cir. 1940), affg. a Memorandum Opinion of this Court, cert. denied 311 U.S. 688 (1940); *Baton Coal Co. v. Commissioner*, 51

---

[3] All section references are to the Internal Revenue Code as in effect during the years in issue.

F. 2d 469 (3d Cir. 1931), affg. 19 B.T.A. 169 (1930), cert. denied 284 U.S. 674 (1931); *Galatoire Bros. v. Lines,* 23 F. 2d 676 (5th Cir. 1928); *University Properties, Inc.,* 45 T.C. 416 (1966), affd. 378 F. 2d 83 (9th Cir. 1967).[4]

It is well settled that respondent's determination is presumptively correct, and that petitioner has the burden of proof. *Welch v. Helvering,* 290 U.S. 111 (1933). We hold that petitioner has met its burden of proof here.

Petitioner began its cold storage operations in 1945 and continued thereafter to expand and increase its business. Through its successive growth it was unable to independently finance all its expansion, so it negotiated with its landlord, the Port of Bellingham, for assistance. The Port, on the other hand, wanted to improve the geographic area's economic base, hoping that that would stimulate local employment. As a result, the Port agreed to fund many of the improvements petitioner needed. All negotiations between the parties were conducted in good faith and at arm's length.

Petitioner entered into leases with the Port in each of the years 1959, 1962, and 1963. These three leases were consolidated into a single lease in 1964. Petitioner entered into another lease with the Port in 1967. In each case the lease was for land and improvements thereon to be constructed and financed by the Port through the issuance of revenue bonds.

Thomas J. Glenn, manager of the Port, testified that the parties were involved in extended negotiations prior to the execution of each lease. He also emphasized that the Port's primary concern, when negotiating the amount of the rent with petitioner, was the assurance that the rent payments would be large enough to retire the bonds that were issued to finance the leased improvements. He added that the parties did not intend any portion of the annual rent to be consideration for the future use of the improvements. The record reflects that the only way petitioner could obtain these improvements was to agree to a rent geared to retirement of the bond issues. The Port would have required this amount from any party to which it rented the property.

The leases also provided that either coincident with or shortly after the retirement of the bonds, the rental payments shall be

---

[4] See sec. 1.162–11(a), Income Tax Regs.

renegotiated. Under the 1964 lease, the payments upon renegotiation could not exceed the average ground rental charged by the Port to its other tenants at that time. The 1967 lease also provides that the renegotiated payments shall not exceed the average ground rental charged by the Port at the time of the renegotiation; in addition, the 1967 lease provides for improvement rental not to exceed 5 percent of the depreciated cost of the improvements averaged over 5 years. Both leases provide that if the improvements are destroyed and neither the Port nor petitioner elects to rebuild the improvements, then the rental will be reduced to $900 per acre per year (the ground rental for unimproved land charged by the Port at the dates the leases were executed).

Respondent in his determination allocates the rent payable under the leases between "land" rent and "improvement" rent, and then allocates a portion of the "improvement" rent paid in the years in issue to future years. Respondent argues that all rent paid during the first part of the lease period (prior to renegotiation) in excess of $900 per acre per year is for improvements. In the case of the 1964 lease respondent argues that since the renegotiated rent in the second part of the lease cannot exceed the average ground rent then charged by the Port, the renegotiated payments are entirely allocable to the land. In the case of the 1967 lease, the renegotiated payments will not exceed the average ground rental then charged by the Port, plus a minimum of 5 percent of the depreciated costs of the improvements averaged over 5-year periods. Respondent then determines the amount of renegotiated rent attributable to the improvements under the 1967 lease, and argues the rest is solely allocable to the land. Respondent asserts that the "conclusion is inescapable that increased improvement rental is being paid by petitioner in the first part of the leases to compensate for the use of the improvements over the entire length of the lease," and then, under regulations section 1.162–11(a), spreads the improvement rental over the length of the leases and allows only a pro rata deduction of such rent for each of the years in question.

Respondent's theory has insufficient basis in fact. Respondent has excised segments of the leases and analyzed them out of context, without considering the intent of the negotiated whole. Mr. Glenn testified that the Port's financial adviser recommended that petitioner's annual rent be geared to the

amounts necessary to retire the bonds. The rent was not geared to land values. In order to occupy and use the improvements currently petitioner had to pay a determined annual rent that did not distinguish between land and improvements. Both parties intended the annual rent to be for the current use and occupancy of the improvements. See *Southwestern Hotel Co. v. United States, supra.* We do not find that the rent payable during this period exceeds fair annual compensation to the Port for the use of the property. In fact, the Port bargained for and expected, generally speaking, only a minimum or no profit. Its principal motive was to encourage development of the area. We are not convinced on the facts before us that respondent should be allowed to unilaterally rewrite effective leases between the parties. Further, it is apparent that petitioner would probably be paying higher rather than lower rentals in the future during the period after the renegotiation. If the $900-per-acre provision noted by respondent were in fact for "land" rent (as respondent argues), one could also argue that even though the ground rent charged other tenants was to be the maximum renegotiated rent during the second part of the leases, any rent in excess of $900 per acre during the second part of the leases was for the improvements. Analysis of the situation must take into account the fact that the leases in question were not written on a blank slate. Petitioner already had fully binding and favorable long-term leases before commencing the 1964 negotiations. Here the fact that the maximum rental under the renegotiation clause was tied to land values rather than improvement values merely reflected petitioner's favorable bargaining position. Petitioner was not required to permit complete reopening and a renegotiation up to a rental based on both land and improvements after 25 years. It could and did settle for a more favorable maximum based only on ground rentals. However, this does not, under the circumstances here, convince us that any part of the rent during the earlier period was properly allocable to the "back end" of the lease.

There is no indication that the annual rent paid in the years at issue was disproportionately higher than amounts that would be paid in later years. A discrepancy of this nature might indicate that a portion of the annual rent was advance payment for future use and occupancy. *Main & McKinney Bldg. Co. v. Commissioner, supra; Baton Coal Co. v. Commissioner, supra.* But the record reflects that the rent would increase in the future. The

Port, realizing this as early as 1962, had wisely provided for renegotiation provisions.

There is also no indication in the record that tax motivation was a force for structuring the transactions this way. The tax implications of the rent were not even considered. We see nothing inherently wrong with the Port gearing the rent to the amount it needed to fund repayments of its bond issues.

Respondent correctly argues that reasonableness of rent is not at issue when determining whether portions of payments deducted as rent under section 162(a)(3) are advance rent. That Code provision does not talk in terms of a reasonable allowance. *Anderson Dairy, Inc.*, 39 T.C. 1027, 1043 (1963); *American Metal Products Corporation*, 34 T.C. 89, 105 (1960), affd. 287 F. 2d 860 (8th Cir. 1961); *Stanley Imerman*, 7 T.C. 1030 (1946). However, what is clear is that the rent charged petitioner was determined between unrelated parties as a result of arm's-length bargaining, and appears, even during the initial periods, to be no more than a fair rent under the circumstances.

This case turns on its facts, and there is no factual basis for respondent's allocation of the rent between "land" rent and "improvement" rent, the determination from which all respondent's arguments flow. The parties to the leases intended and treated the rent as for the undivided whole, and we so find. Since we do not adopt respondent's allocation theory, there is no factual basis on which to conclude that petitioner was paying advance rent.

In order to reflect our conclusion herein and the concessions of the parties,

*Decision will be entered under Rule 155.*