VELVET HORN, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Velvet Horn, Inc. v. Commissioner
Docket Nos. 11171-77, 12052-78.
United States Tax Court
T.C. Memo 1981-227; 1981 Tax Ct. Memo LEXIS 516; 41 T.C.M. (CCH) 1445; T.C.M. (RIA) 81227; May 6, 1981. William J. Currer, Jr., and Arthur G. Longoria, for the petitioner. Irene Scott Carroll, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined deficiencies in petitioner's Federal *517 income tax as follows: Docket No.
Year Ending
Deficiency
12052-78
6/30/72
$ 1,046.52
11171-77
6/30/73
24,272.26
11171-77
6/30/74
32,063.40
12052-78
6/30/75
16,100.13
12052-78
6/30/76
7,227.75
Concessions having been made, the sole issue remaining for decision is whether petitioner is entitled to deduct amounts claimed as rent in excess of that allowed by respondent. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioner, Velvet Horn, Inc., is a California corporation with its principal place of business in Buena Park, California. It timely filed its Federal corporate income tax returns for all of the taxable years in issue with the District Director of Internal Revenue Service at Fresno, California. Petitioner was incorporated on May 29, 1969, for the primary purpose of operating a restaurant. At that time its shareholders and officers were: Raymond F. Phillips, president (40 percent); L. H. Heacock, vice president (20 percent); Harry N. Smith, secretary (20 percent); and Vernon F. Lawrence, treasurer (20 percent). (These individuals shall hereinafter be referred to by their surnames.) On December 5, 1969, Lawrence *518 transferred his shares to Smith. Robert B. Compton (hereinafter Compton) purchased 50 shares (5 percent) and Heacock purchased an additional 10 shares (5 percent) on September 25, 1970, from Phillips and Smith who each transferred 30 shares. On March 22, 1971, Smith resigned from the board of directors of petitioner and, concurrently, his remaining shares of stock were redeemed by petitioner. Thus, at this point Phillips, Heacock, and Compton were the sole, and equal, shareholders of petitioner. At some point prior to January 1, 1971, Compton, Phillips, Smith and Heacock formed an equal partnership (hereinafter referred to as the partnership), the purpose of which was to finance and build the facilities necessary for petitioner to operate its business. This was necessitated by petitioner's inability to obtain financing. Compton contributed $ 24,000 while each of the other partners contributed $ 22,000 to the partnership. Additionally, the partnership obtained 2 loans--one from an unrelated individual in the amount of $ 35,000 and one from a lending institution in the amount of $ 15,000. These loans were personally guaranteed by the partners and secured by the partnership assets. *519 The partnership proceeded to construct the restaurant facility. Phillips, a general contractor, and Smith, a plumbing contractor, each performed a significant amount of the work at no charge to the partnership. Construction and fixturizing the restaurant were completed on or about July 1970, at an out-of-pocket cost of approximately $ 140.000. Smith withdrew from the partnership on March 3, 1971. The petitioner's business was to be situated on leased land in Buena Park, California. On November 3, 1969, petitioner leased land near a freeway under construction which was formerly farm land from C.J. and Belm Lyons (hereinafter referred to as the lessors) for a term of 25 years. The lease provided, inter alia, that the petitioner would build and maintain a restaurant facility and pay ground rent in the amount of $ 650 per month (adjusted for inflation) plus three percent of gross monthly receipts from the restaurant operation in excess of $ 21,667. The then shareholders of petitioner personally guaranteed the completion of all improvements. As a result of the petitioner's inability to obtain financing, on January 1, 1971, the November 3, 1969, lease was terminated and a new lease *520 was entered into between the partnership and the lessors. Although the minimum monthly rental was increased under the new lease, most other material provisions remained largely unaffected. On May 15, 1971, the partnership and the petitioner entered into a "sublease and assignment" whereby, along with certain oral modifications, effective January 1, 1971, the petitioner subleased the land and improvements and leased all of the personal property needed to operate its restaurant at 15 percent of its gross sales plus the 3-percent ground lease for a period of approximately 15 years. It was the petitioner's and the partnership's accountant who advised that a 15-percent net rental was an appropriate charge. This document contained a clause providing, effective April 1, 1985, that the partnership transfer all of its rights and obligations under the ground lease to the petitioner. Under the ground lease, as well as the sublease, the partnership was obligated to maintain and repair all lease improvements, pay sewer expenses, insurance and taxes on the property. From April 1, 1985, until the ground lease terminated in 1995, the petitioner had no further obligation to pay the partnership *521 any funds directly, but it was required to fulfill all of the obligations theretofore required of the partnership. In 1975, by an oral modification, the rent required to be paid by petitioner was reduced to 12 percent of gross sales plus the 3-percent ground rent. This was due, in part, to the partnership's failure to obtain additional land for expansion. The petitioner's restaurant began operation in late 1970. Its business was an immediate success, earning a profit from its third month of operation. Phillips had complete management responsibility since he had experience in the restaurant business. He worked there full time at a minimal wage. Compton and Heacock did not actively participate in the operation of petitioner. [1]
In late 1970 or early 1971 the freeway near petitioner, under construction since prior to 1969, was completed. Petitioner's business grew rapidly. Its gross income for taxable *522 years ending June 30, 1972 through June 30, 1976, was $ 573,264, $ 769,615, $ 911,504, $ 906,150, and $ 933.501, respectively. Throughout this period five improvements were made to the restaurant facility by the partnership. By 1976 the restaurant was twice its original size and, additionally, it had an expanded parking lot. The partnership investment in the restaurant facility also increased over this period. Its balance sheets for the calendar years ending December 31, 1971 through December 31, 1976, showed gross fixed assets of $ 183,291, $ 198,984, $ 209,407, $ 290,892, $ 292,953, and $ 296,370, respectively. Beginning in 1972 or 1973 the area around petitioner began to develop extensively. There was significant commercial, industrial, and residential construction. Although substantially built up, the area was still growing at the time of trial in the instant case. Petitioner's business, however, leveled off in about 1976. It could obtain no more land and was operating at full capacity. Increased revenues from that point on would be largely due to inflationary factors. For taxable years ending June 30, 1973 to June 30, 1976, petitioner deducted rents in the approximate *523 respective amounts of $ 137,719, $ 163,323, $ 149,174, and $ 139,640. Respondent has determined that these amounts are excessive and has disallowed them to the extent that they exceed 10 percent of petitioner's gross receipts for the years in issue. [2]
OPINION Respondent seeks to disallow a portion of petitioner's claimed rent deduction on two grounds. [3] At trial his sole contention was that rent paid by petitioner was excessive and that to the extent it exceeded a reasonable rental for each respective year it constituted a constructive dividend to the shareholders and was nondeductible under section 162(a)(3). [4] On brief, while still maintaining that rents were excessive, respondent's sole position is that to the extent rents paid exceed a reasonable rental they constitute *524 capital expenditures--either prepaid rental or prepaid purchase price of the leasehold for the period from 1985 to 1995--and are nondeductible under section 263(a). [5]
*525 Petitioner considers it immaterial whether the partnership was related to it at the time the sublease and assignment was executed. As respondent suggests, this is clearly not the case. A rental agreement between related parties should be closely scrutinized, while one entered into by unrelated parties dealing at arm's length is usually presumed reasonable. Davis v. Commissioner, 26 T.C. 49, 56 (1956). Because the partners of the partnership and the shareholders of petitioner were the same individuals with the same proportionate ownership interest on May 15, 1971, [6] a close relationship did exist and, thus, we will closely scrutinize the transaction. In so doing we shall look to what unrelated parties dealing at arm's length would have done under otherwise similar circumstances. Utter-McKinley Mortuaries v. Commissioner, 225 F.2d 870 (9th Cir. 1955), affirming a Memorandum Opinion of this Court. Imerman v. Commissioner, 7 T.C. 1030 (1946). The burden of proof as to reasonableness, as well as the nature of the payments, rests with *526 the petitioner. Rule 142(a), Tax Court Rules of Practice and Procedure.
Respondent would have us first consider the nature of the payments, as entirely rent or partially capital expenditures, prior to consideration of reasonableness, citing Royal Farms Dairy Co. v. Commissioner, 40 T.C. 172 (1963). In our opinion this is mere sophistry. Although we may have considered it appropriate on the particular facts of that case to rule on the nature of the payment first, there is nothing therein to suggest a rule of general application. Furthermore, under the facts of the instant case where both issues must ultimately be decided, we believe it to be more logical to first decide reasonableness of payments as rent because that determination is highly probative of the true nature of the payments. [7]
*527 Although section 162(a)(3) does not limit rental deductions to a reasonable amount, it is clear that under that section only those payments which are ordinary, necessary, and made as a condition of continued use or possession of property are allowable. Sec. 162(a)(3); Bellingham Cold Storage Co. v. Commissioner, 64 T.C. 51 (1975); Davis v. Commissioner, 26 T.C. 49, 56 (1956). To the extent rental payments are unreasonable, they are not ordinary and necessary and, thus, not deductible. See J. J. Kirk, Inc. v. Commissioner, 34 T.C. 130 (1960), affd. 289 F.2d 935 (6th Cir. 1961). From the record, we are of the opinion that the rents paid by petitioner were reasonable and not unlike rents which would have been paid had the parties to the sublease been unrelated and bargaining at arm's length. As noted above, the question of reasonableness of rent paid under a percentage lease (15 percent of gross sales herein) must be viewed from the time the lease was executed. [8] Here, that date was May 15, 1971. *528 At that time petitioner had been operating its restaurant for less than one year. Although it was known to be profitable by that time, serious questions still existed as to its future. Prior to investing in the venture, Phillips had warned Compton that the risks were severe due to the location of the restaurant and the high failure rate of restaurants, generally. Petitioner's expert, Robert Edward Schultz, whose testimony we have accorded great weight, [9] testified that new restaurants in new areas have a "bankruptcy propensity of in excess of 50 percent" nationally, based on Dun & Bradstreet reports. He considered the venture to be "a very risky situation" for the investors. *529 The petitioner herein, however, had little at risk. It owned only its name and a liquor license. The great bulk of any loss would be borne by the partnership. It had built, according to Mr. Schultz, a single purpose building which could not readily be adapted for use in nonrestaurant businesses. Furthermore, it had provided all of the personalty needed in the restaurant operation, such as fixtures, tables, flatware, and the like. Mr. Schultz testified that in the event of bankruptcy this personalty could be sold for only 10 to 15 percent of cost. It is only reasonable that with strangers of equal bargaining power, as the risk to the lessor increases, and the risk to the lessee decreases, the corresponding percentage rent must increase. Moreover, in the instant case not only did the rent of 15 percent of gross sales have to yield the partnership a reasonable return on investment commensurate with the risks involved, but the partnership had continuing obligations to replace and repair the building, fixtures and equipment as well as to pay the taxes, insurance, and sewerage expenses associated with the restaurant facility. On the basis of all of these factors Mr. Schultz, using *530 the return on investment method, concluded that at the time the petitioner entered into the lease with the partnership the stated rent--15 percent of gross sales plus 3 percent for the ground lease--was entirely reasonable. We must agree. Respondent has requested a finding that seven percent of gross sales is the maximum reasonable rent for the building and personalty (plus three percent of gross sales for the ground lease). Respondent introduced two sets of published financial ratios (both 1978 editions). Both depict national average costs of rent and other expenses associated with restaurants as a percentage of gross sales. The Almanac of Business and Industrial Financial Ratios, which we consider the more authoritative of them, shows rents to be 5.0 percent of gross sales for restaurants the size of petitioner's. However, if the average costs of repairs, real estate taxes, interest and depreciation are added to rent, the total is 14.4 percent of gross sales--an amount very close to that which petitioner herein was required to pay under the sublease agreement. Finally, respondent introduced expert testimony that, based primarily on "comparable" restaurants in the area the *531 fair rental value for the land, improvement, and personal property used by petitioner was between 8.2 percent and 8.7 percent of gross sales. We place very little weight on the report of respondent's expert. In the first place respondent's expert testified that the base rental of "comparables" was calculated as a percentage return on investment; however, he had no knowledge of actual investment in them. Furthermore, he had not obtained any data on the gross sales of "comparables." Additionally, no so-called "comparable" restaurant leased personalty or equipment from the lessor. Perhaps most importantly, the respondent's expert did not even consider the fair rental value at May 1971--the point at which petitioner entered into its lease and the point from which we must test reasonableness. He looked only at fair rental value from 1973 to 1976--a time of dramatic commercial growth in the area around petitioner's business. We do not intend to suggest that respondent's expert was at all unqualified. We do, however, note that this was his first restaurant valuation. Moreover, we believe that the lack of investment and sales data on the expert's so-called "comparables," as well as *532 the fact that he did not consider fair rental value in 1971, raise serious questions as to the relevance and materiality of his report as it relates to the question at issue. Because the record establishes that the rate of rent paid by petitioner to the partnership was fair and reasonable and of a type which similarly situated unrelated parties dealing at arm's length would have agreed upon, we hold that no portion of the amounts paid as rent constitute a constructive dividend to petitioner's shareholders. Our final inquiry is whether, notwithstanding reasonableness, the rental payments were in fact paid as a condition of current use or possession of the property or as something else merely under the guise of rent. Respondent argues that because the petitioner was to pay rent for 15 years but have the right to the property for 25 years the rental payments in excess of 10 percent of gross sales were in fact paid for future use of the property, either as advance rent or payment for the assignment of the leasehold and, thus, are not currently deductible. Sec. 263(a); Bellingham Cold Storage Co. v. Commissioner, 64 T.C. 51, 57 (1975). *533 This is a question of fact to be determined in light of all facts and circumstances surrounding the transactions. University Properties, Inc. v. Commissioner, 378 F.2d 83 (9th Cir. 1967), affg. 45 T.C. 416 (1966); Bellingham Cold Storage Co. v. Commissioner, supra.Petitionner asserts that the facts support only a finding that amounts paid as rent were for current use of the property. We again agree with petitioner. The partnership in the instant case was formed for a limited purpose, viz, to finance, construct and equip a restaurant for use by petitioner. Additionally, it was basically to manage the facility, keeping it in good repair, paying taxes and insurance costs, and to build improvements in the event the petitioner's success made it appropriate to do so. It also served to insulate the assets used by the corporation from various corporate liabilities. It is apparent that the partnership desired only a 15-year life. By 1985 it would have recouped its investment and the restaurant, if still operating, would be financially self-reliant. Furthermore, the partnership *534 no longer wanted to be obligated to pay rent under the ground lease or to maintenance, repairs, and replacements under the sublease. This is a major concern in light of greatly higher anticipated repair, replacement, and maintenance costs, which could be expected with 15-year-old improvements and equipment. In order to accomplish this the partnership agreed with the petitioner that the latter would be directly responsible to the lessors under the ground lease. In exchange for this and the elimination of the obligation to pay rent under the sublease the petitioner agreed to assume all of the partnership's obligations under the sublease. Viewing the terms from the time the agreement was entered into, the obligations assumed by petitioner are a fair consideration for the release of the leasehold and the right to current rents. In light of the diminished value of a 25-year leasehold after 15 years had passed and the likely increased costs of maintenance, repairs, and replacements associated with the restaurant facility, as well as our finding that the rate of rent was reasonable for the years in issue, we hold that no part of the rental payments at issue were in fact advance rent or *535 prepayments for the purchase of the leasehold. The petitioner was not to pay for 15 years and receive 25 years. It was to pay under one set of terms for the first 15 years and under another set of terms for the remaining years. We disagree with respondent that the decrease in the rate of rent in 1975 from 15 percent to 12 percent evidences petitioner's financing of the land improvements. Testimony revealed that the rate was reduced by oral modification because improvements which were anticipated in the original rate, assuming the petitioner's success, could not be made due to the partnership's inability to obtain the additional land. In order to reflect our conclusions herein and concessions by the parties, Decisions will be entered under Rule 155. Footnotes
1. Phillips died in June 1974. At that time his stock in petitioner and interest in the partnership passed to his wife, Lois H. Phillips, who then became a paid employee of petitioner. After Phillips' death the petitioner hired a professional manager for the restaurant.↩
2. Respondent has disallowed petitioner's rent deduction for its taxable years ending June 30, 1973 through June 30, 1976, in the approximate respective amounts of $ 60,758, $ 72,172, $ 59,072, and $ 46,405. Petitioner's taxable year ending June 30, 1972, is in issue only insofar as respondent's determination as to excessive rents negates the existence of a net operating loss carryback to that year.↩
3. Respondent has not argued the application of section 482 to the facts of the instant case and, therefore, we consider discussion of it herein to be inappropriate. See Rubin v. Commissioner, 56 T.C. 1155↩ (1971). 4. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended, and in effect during the taxable years in issue. ↩
5. Although respondent's silence on brief as to the constructive dividend issue may represent a withdrawal of that argument, we shall assume that such was not intended. Furthermore, we note that if respondent is successful in its capital expense argument, the petitioner will be entitled to either rent or depreciation deductions for the 1985-1995 period for the contract rentals held to be capital expenditures. On the other hand, if respondent is successful with respect to its constructive dividend argument, amounts disallowed as rent would not represent items deductible at any time. Finally, we note that the individual shareholders are not parties to the instant litigation. Presumably, this is due to the fact that their respective incomes would not be affected by the result herein. They are equal shareholders and equal partners reporting income on the cash method. To the extent that rent is disallowed, as being in fact a capital expense, their distributive share of partnership income would be the same as reported. To the extent excess rents constitute constructive dividends, their distributive share of partnership income would be reduced by the amount of dividends constructively received.↩
6. Both parties to the instant litigation agree that the relevant time for testing reasonableness of rent and the relationship of the petitioner to the partnership is at the inception of the agreement between them.↩
7. See Post Bros. Construction Co. v. Commissioner, T.C. Memo. 1973-257↩.
8. West Virginia Tractor & Equipment Co. v. Commissioner↩, a Memorandum Opinion of this Court dated December 31, 1953.
9. Mr. Schultz's qualifications include, to mention only a few: B.S., University of Southern California (finance statistics in accounting); M.B.A., University of Southern California; Ph.D., Wharton School, University of Pennsylvania; full professor, University of Southern California; author of four college text books in finance and insurance; consultant to Pepsi Cola International, Metropolitan Life Insurance Company, and other corporations; director of eight publicly held and traded corporations; president of an economic consulting company; president and trustee of City National Development Trust and REIT; director of City National Bank; consultant to the board of governors of the California State Bar; and he has testified in state and Federal courts on over 500 occasions for both defense and plaintiff, often concerning valutions (some restaurants) and similar investigations.↩