T.C. Memo. 2021-45

UNITED STATES TAX COURT

PLENTYWOOD DRUG, INC., ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 17753-16, 17754-16,       Filed April 26, 2021.
17755-16.

W. Scott Green, for petitioners.

Timothy M. Peel, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, Judge: Plentywood Drug, Inc., is a Montana corporation that
operates the only pharmacy in Plentywood, Montana. The pharmacy rents space

---

[1] We consolidated two cases with this one: Robert and Marilyn Mann,
docket No. 17754-16; and Marvin and Kathryn Eberling, docket No. 17755-16 .

[*2] in a building that has four owners, who are also its four shareholders. The Commissioner says that the corporation has been paying its shareholders too high a rent, which would make some of that rent a nondeductible dividend. The shareholders disagree.

We must decide what a fair market rent for the building is.

FINDINGS OF FACT

A.    Background

Plentywood is a town of 1,700 people in northeast Montana. Local legend has it that the nearby Plentywood Creek and the town of Plentywood get their name from a search for firewood. Dutch Henry who, though notorious in Montana history as a skilled horse thief, was reportedly an otherwise pleasant man and a talented cowboy, amused himself one day by watching a chuckwagon cook struggle to start a fire with damp buffalo chips. He finally took pity on the man and told him to hike two miles up the creek where he could find "plenty wood."[2] The first business was opened in the town in 1900, and a post office followed in 1902. A branch line of the Great Northern arrived a few years later, and Plentywood incorporated in 1912.

---

[2] See The Outlaw Dutch Henry, The Montana Pioneer (July 2010), https://montanapioneer.com/the-outlaw-dutch-henry/ (last visited Feb. 24, 2021).

**[\*3]** It was the expectation of early settlers in the state that "rain follows the plow." Those homesteaders were often disappointed in their hope, but it was definitely the case in Plentywood that druggists preceded incorporation. Plentywood Drug opened in 1910 and two years later became Plentywood Drug, Inc. It is still, more than a century later, a frontier pharmacy.[3] It serves people in four counties that span 7,200 square miles, where there are to this day only about 2 people per square mile. (Washington, D.C., has more than 11,500 people per square mile.) Plentywood Drug is now owned by Robert Mann, his wife Marilyn Mann, and the Manns' daughter and son-in-law Kathryn and Marvin Eberling. The Eberlings each own 49.42% of the corporation's stock, while the Manns each own 0.58%.

Plentywood Drug has a single store on Main Street near the center of town. Its building has 8,125 square feet of retail space on the main level and 5,250 square feet of support area below. The store is a full-line pharmacy, but is also stocked as a convenience store for the community--it sells everything from

---

[3] "Frontier pharmacy" is a real term in federal law. It's a pharmacy in what the Patient Protection and Affordable Care Act defines as a "frontier health professional shortage area," an area "with a population density less than 6 persons per square mile within the service area * * * and * * * with respect to which the distance or time for the population to access care is excessive." Patient Protection and Affordable Care Act, Pub. L. No. 111-148, sec. 5002(b)(2), 124 Stat. 119 at 591 (2010).

[*4] groceries to toys. It uses the basement to store both inventory and business records. Robert Mann bought the building around 1978, and it is now co-owned in four equal shares by the Manns and the Eberlings.

That brings us to the problem that is central to this case. Plentywood Drug pays rent to the four owners of the building. The two couples set the terms by oral agreement at the beginning of each year. They did not, for the years at issue here or for any other years, put these terms into a formal written lease signed by themselves once in their capacity as owners of the pharmacy and then again as owners of the building. But we do know what rent the corporation paid in 2011-13:

| Year | Amount |
|------|--------|
| 2011 | $83,584 |
| 2012 | 192,000 |
| 2013 | 192,000 |

Because the couples each owned half the building, they reported the same amounts on their returns:

| [*5] | 2011 | 2012 | 2013 |
|------|------|------|------|
| Robert and Marilyn Mann | $48,584 | $96,000 | $96,000 |
| Marvin and Kathryn Eberling | 35,000 | 96,000 | 96,000 |

Plentywood Drug deducted this rent from its corporate income each year, which allowed it to avoid double taxation on those amounts.[4]

B.    Audit and Trial

The Commissioner audited Plentywood Drug for tax years 2011-13; he then lassoed the Manns and the Eberlings into an expanded audit and finally issued notices of deficiency to both them and their corporation.  The parties were able to resolve all the proposed adjustments except for those related to the rent paid to the couples as lessors and deducted by Plentywood Drug as lessee.  The Commissioner disallowed large parts of those deductions on the ground that the rent paid was greater than what a fair market rent would have been for each year in issue.  The Commissioner also recharacterized the allegedly excess rent as

-------

[4] Corporations are subject to double taxation because the Code taxes income first when the company receives it and then again when the company distributes it to its shareholders.  See Prescott v. Commissioner, 66 T.C. 128, 138 (1976), aff'd, 561 F.2d 1287 (8th Cir. 1977).  For a historical account of the development of double taxation, see Steven A. Bank, "Is Double Taxation a Scapegoat for Declining Dividends? Evidence From History," 56 Tax L. Rev. 463, 479-516 (2003).

**[*6]** constructive dividends and branded all petitioners with accuracy-related penalties under section 6662(a).[5]

Both couples and Plentywood Drug timely filed petitions. We consolidated the cases and tried them in St. Paul. Both parties presented expert testimony regarding the fair market rent for the building. The Commissioner did not introduce any evidence during trial that he'd complied with section 6751(b)(1) before he determined that Plentywood Drug and its owners owed penalties. See Graev v. Commissioner, 149 T.C. 485, 493 n.14 (2017) (citing Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42), supplementing and overruling in part 147 T.C. 460 (2016).

At the time the petitions were filed Plentywood Drug's principal office was in Plentywood and both the Manns and the Eberlings were Montana residents.[6]

---

[5] All section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless we say otherwise.

[6] Presumptive appellate venue would thus lie in the Ninth Circuit. See sec. 7482(b)(1)(A) and (B).

**[\*7]**                                    OPINION

I.      Ordinary and Necessary Business Expenses

The rules we apply today are well settled.  Section 162(a) allows a taxpayer

to deduct the "ordinary and necessary" expenses he pays in carrying on a trade or

business.  The Code specifically lists the rent paid by a business as one of these

deductible expenses.  Sec. 162(a)(3).  But for an expense like rent to be ordinary

and necessary, it must also be reasonable in amount.  United States v. Haskel

Eng'g & Supply Co., 380 F.2d 786, 788 (9th Cir. 1967).  Any part of rent that is

unreasonable is not ordinary and necessary and thus not deductible.  Velvet Horn,

Inc. v. Commissioner, 41 T.C.M. (CCH) 1445, 1449 (1981).

The Commissioner does not often question the reasonableness of a rent

agreed to by parties at arm's length.  But he does sometimes look closely to the

fairness of rent charged when landlord and tenant might not have an incentive to

drive a hard bargain:

> When there is a close relationship between lessor and lessee and in
> addition there is no arm's length dealing between them, an inquiry
> into what constitutes reasonable rental is necessary to determine
> whether the sum paid is in excess of what the lessee would have been
> required to pay had he dealt at arm's length with a stranger. * * *

Place v. Commissioner, 17 T.C. 199, 203 (1951), aff'd, 199 F.2d 373 (6th Cir.

1952); see also Safway Steel Scaffolds Co. of Ga. v. United States, 590 F.2d 1360,

**[\*8]** 1362 (5th Cir. 1979).  The Commissioner sometimes suspects that a corporation might call a payment to its shareholders something like rent, which is deductible, when the economic reality is that it's a distribution of profits.  If his suspicion turns out to be true, the seemingly deductible expense is actually a nondeductible dividend.  Tax law calls such a dividend a "constructive" dividend because the corporation itself doesn't call it that on its books.  See Rosser v. Commissioner, 99 T.C.M. (CCH) 1035, 1039 (2010); Benson v. Commissioner, 88 T.C.M. (CCH) 520, 534 (2004).  Shareholders have to include constructive dividends in their taxable income under section 61(a)(7).[7]  These kinds of cases are disputes about value, and as in any valuation dispute we may use testimony from experts, see Harmon City, Inc. v. United States, 733 F.2d 1381, 1383-84 (10th Cir. 1984), and may look at all the circumstances of the case and the entire history of transactions between the parties, Safway Steel Scaffolds, 590 F.2d at 1362.

---

[7] Plentywood Drug contends that the Commissioner may not recharacterize the rent that it pays as qualified dividends under section 482.  But the Commissioner did not rely on section 482 to reclassify the rent.  Section 482 caselaw is not relevant here.

**[*9]** II.     <u>Fair Market Rent</u>

A fair market rent is one at which "the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs. The parties in these cases quickly realized that finding comparable properties in a town of 1,700 people in frontier Montana and then using them to come up with a fair market rent would be difficult. One problem right out of the chute is that Montana is a nondisclosure state. This means that real-estate data such as sales prices that appraisers can typically find in other states is legally confidential and simply not available. This issue is magnified in a town the size of Plentywood, which already has a limited number of even potentially comparable buildings. We heard entirely credible testimony that Montanans--perhaps especially Montanans in small communities--don't commonly share details of their financial lives very readily with strangers. The Commissioner's expert was particularly credible in his statement that when he tried to find information in Plentywood he did not identify himself as an IRS agent.

[*10] Despite this very significant problem, the parties were able to make as reasonable a presentation as they could.[8] We'll describe the competing valuations and then give our own analysis.

### A.    Petitioners' Valuation

Petitioners introduced a rent-survey report prepared by Craig McIvor, a real-estate appraiser certified in Montana and North Dakota, as well as the owner of a property-management company in Williston, North Dakota. McIvor conducted his survey by rounding up what data he could from a number of rental properties, in both Plentywood and in Williston. He also testified--and here we make a specific finding that he was credible when he did--that he did not know the rent that Plentywood Drug had paid before he finished his survey.

McIvor also carefully made clear that his analysis was a survey and not an appraisal. He stated that one doesn't appraise rent, one estimates rent, and he viewed his assignment as collecting information about rents in the area and at the time in question. He got his data from leases on multiple properties both in Plentywood and Williston. He first looked at a lease for the U.S. post office in

---

[8] We don't need to decide whether the burden of proof shifted to the Commissioner on this issue because we are able to decide the matter by a preponderance of evidence. See Knudsen v. Commissioner, 131 T.C. 185, 188-89 (2008) (citing Blodgett v. Commissioner, 394 F.3d 1030, 1039 (8th Cir. 2005), aff'g T.C. Memo. 2003-212).

[*11] Plentywood. That post office is a federal government facility and the USPS makes public information about the rent it pays. This data is one of the few public sources of information about commercial rental properties in Plentywood. It showed that the USPS had a ten-year lease beginning in 1998 for $18 per square foot that was renewed in 2008 for $15.90 per square foot. McIvor also looked at businesses located in Williston, and found information there about rents for an office building and a pharmacy. McIvor found leases ranging from $15 per square foot to $30 per square foot in Williston. He also credibly stated that rents in Williston were increasing during the years at issue because the town found itself in the middle of the North Dakota oil boom of the late 2000s and early 2010s. He concluded a fair market rent for Plentywood Drug would be $25 per square foot for the main floor.

Both Plentywood Drug and McIvor stated that the building's basement was necessary for the business, if not for its retail operation. The only comparable McIvor could find for this space was a finished basement in the drugstore building in Williston that was renting for $18 per square foot. He thought this was too high for storage space and concluded that a better number in Plentywood would be about half that, or $8-$9 per square foot.

**[*12]** B.　　The Commissioner's Valuation

The Commissioner's expert witness was Howard Blanding, a senior appraiser for the IRS whom we recognized as an expert in real-estate appraisal. Blanding corralled his data from Plentywood alone. He noted that this was difficult because of the sparse data available, but that he chose to stick with comparables in Plentywood instead of looking to those in Williston because Williston is a much larger city with what he thought was a completely different economy.

That left Blanding with four properties as his comparables--two government-subsidized multifamily residential buildings, the post office, and a 625-square-foot commercial retail property. For each of these, Blanding adjusted the rent actually charged for positive and negative differences between them and Plentywood Drug's building. Here is what he concluded:

|  | Subject | Rental 1 | Rental 2 | Rental 3 | Rental 4 |
|---|---|---|---|---|---|
| Rent amount | N/A | $74,760 ($6.14/sf) | $78,300 ($15.26/sf) | $6,000 ($9.60/sf) | $86,400 ($6.55/sf) |
| Lease year | 2011-13 | 2011-13 | 1998-2018 | 2013 | 2017 |
| Age/Con-dition | Remodel/ Avg. + | 1976/ Avg. | 1997/ Good | Older/ Avg.- | Remodel/ Avg.- |

| [*13] Category type | Retail | Multi-family | Post office | Retail | Multi-family |
|---|---|---|---|---|---|
| Size (sq. ft.) | 8,125 | 12,168 | 5,130 | 625 | 13,200 |
| Utilities | No (Assum.) | No | No | No | Yes |
| Storage | Partial basement | None | None | Full basement | None |
| Net adjust. % | N/A | 0% | -45% | -16% | -7% |
| Adjusted $/sf | N/A | $6.14 | $8.39 | $8.06 | $6.09 |

He made both general and specific adjustments. His general adjustment was for the lease year of his comparables. He reasoned that older leases became submarket as time went on, and so he assumed that fair market rents would, all other things being equal, rise each year by the average Consumer Price Index (CPI) increase of 1.4% per year. He also made specific adjustments for each of his comparable properties. He noted the age and condition from his own observations. He adjusted for different types of property to reflect their different costs--he noted that retail properties generally have lower construction costs than apartments or offices because of their large open areas.

**[\*14]** He adjusted for the different square footage of his comparables. He even adjusted the square footage of the post office. The lease information for the post office, publicly available, lists the size of the property and the rent paid by the government each year. The size of the post office is 4,276 square feet and the rent paid by the USPS is $68,000 per year, or $15.90 per square foot. In his report, however, Blanding stated the size of the post office was 5,130 square feet, which led to a lower rent per square foot. His justification was that the square footage on the website was a measure of its interior space. He said he needed to adjust this number to square footage calculated from the outside to be consistent with the other comparables used in his report. He also reported the rent as $78,300, which is what the USPS paid under its original lease in 1998. When the USPS renewed its lease in 2008, the rent fell to $68,000. Blanding didn't explain why he used $78,300 instead of the more recent rent of $68,000.

He adjusted the square footage of Plentywood Drug's building by entirely leaving out the 5,250 square feet of basement space. He did this, he said, because the basement was hard to access, had a low ceiling, and contained large items that could not be removed. He instead made the presence or absence of storage another item in his growing herd of adjustments for the comparable properties.

**[*15]** All this led him to find an average rent per square foot of $7.17. He rounded this to $7.20 for 2012. With 8,125 square feet as the size of the drugstore building (remember that he omitted the more than 5,000 square feet of basement space), he concluded that a fair rent would have been $58,500 for 2012. He then used his CPI deflater to decrease this number to $57,681 for 2011, and increase it to $59,319 for 2013.

C.    Analysis

Each party had some reasonable criticisms of the other party's expert. The Commissioner argued that McIvor should have followed the Uniform Standards of Professional Appraisal Practice (USPAP) and, even if he didn't, that he should at least have made adjustments for his comparable properties from Williston to reflect the differences between that area and Plentywood. McIvor claimed that he did not need to follow USPAP because he prepared a rent survey and not an appraisal, but the Commissioner is correct that opinions on market rent for commercial properties are considered appraisals subject to USPAP standards. See USPAP 2016-2017 ed., Frequently Asked Questions 285, Question 161 "Market Rent Opinion." McIvor's report would not qualify under those standards as an "appraisal". It is simple in form and lacks the usual thickeners of an appraisal-- pages about the economy in the subject area, a USPAP certification, and a

[*16] definition of market value, for example. But it does have relevant data, and that too is helpful to a factfinder.

The Commissioner's criticism of McIvor's use of comparable properties in Williston also has some merit. Williston is only about a one-hour drive from Plentywood,[9] but it has a population more than eight times as large. It also has a stronger economy and a stronger rental market because of its larger population.

Plentywood Drug had some pointed criticisms of its own about Blanding's work. When a town is so small that an appraiser looking for comparables for retail space ends up looking at apartment buildings, perhaps it might be wiser to go to the next town over. In this case, that town is Williston--and Plentywood Drug says Blanding could have found comparables there. It denies that there are material differences in the economies of the two towns.

Plentywood Drug also takes issue with the adjustments that Blanding made. Two in particular that it thought unjustifiable were a downward adjustment of 45% for the Plentywood post office and Blanding's decision not to compute a dollar amount per square foot for the drug store's basement.

---

[9] Testimony about this minor point was unchallenged, but we note that it does imply Montanans drive upwards of 75 m.p.h. on their roads.

**[\*17]** We are of course not bound by the opinion of any expert witness and may accept or reject expert testimony in the exercise of our sound judgment. Helvering v. Nat'l Grocery Co., 304 U.S. 282, 295 (1938); Williams v. Commissioner (In re Williams Estate), 256 F.2d 217, 219 (9th Cir. 1958), aff'g T.C. Memo. 1956-239. We may also choose which part of an expert's opinion, if any, we will accept. Parker v. Commissioner, 86 T.C. 547, 562 (1986).

We start by looking at the Commissioner's criticism of McIvor. He argues that McIvor's failure to adhere to USPAP makes his report unreliable and entitled to no weight. It is true, as the Commissioner points outs, that Montana and North Dakota require licensed appraisers to follow USPAP, see Mont. Code Ann. sec. 37-54-403 (2017); N.D. Cent. Code sec. 43-23.3-18 (2017), but state laws are not federal rules of evidence. Our Court has itself found that an expert's valuation opinion that does not comport with USPAP is still admissible, although it may or may not be helpful. See Epco, Inc. v. Commissioner, 77 T.C.M. (CCH) 1731, 1735 (1999). We have "decline[d] to adopt USPAP as the sole standard for reliability of an expert appraiser under Rule 702 of the Federal Rules of Evidence." Whitehouse Hotel Ltd. P'ship v. Commissioner, 131 T.C. 112, 128 (2008), rev'd on other grounds, 615 F.3d 321 (5th Cir. 2010). That McIvor's report was not an appraisal under USPAP may affect the weight we give his

**[*18]** testimony but does not by itself make it so unreliable as to be inadmissible.
See id.

We take more seriously the problem of using comparables from Williston.
Although the properties McIvor found are very similar to Plentywood Drug's retail
space, we also find that the difference in market areas is very great. Williston has
a larger population than Plentywood and rents there have been much affected by
the oil boom. It's possible that the boom also affected Plentywood, but neither
party put in any solid proof of that--for example, evidence of a surge in population
or business formation--into the record of these cases. We therefore do not accept
the Williston properties as being reasonable comparables.

But we also question the comparability of the properties that the
Commissioner used. His expert used two residential properties in his analysis.
Government-subsidized multifamily residential housing is like a retail drugstore in
that both are rented. But not in much else. Blanding tried to deal with this by
making adjustments, but we do not believe this is a reliable way to overcome the
differences between the properties. He also used a small donut shop as a
comparable in his analysis. Using a retail space is an improvement on using
residential housing, but this particular shop is only 625 square feet, a small

**[\*19]** fraction of the size of Plentywood Drug, and we therefore find that it is not a reasonable comparable either.

Blanding also shrank the fair market rent for the drugstore by not taking into account the 5,250 square feet of its used and useful basement space. We therefore do not accept his conclusions on what a fair market rent for the drugstore would be.

We think that under these unusual circumstances we can use the one property that both parties agree is comparable--the Plentywood post-office building--to begin to figure out a fair market rent for the Plentywood Drug building. We find it more likely than not that it's the property that would most accurately represent the fair market value of large retail space in Plentywood during the years at issue. Yet even though both parties agree that the post office is comparable, they disagree about the number of square feet it has. Blanding stated that the size of the post office was 5,130 square feet because he measured its area from the exterior. McIvor looked at the USPS website and copied down the 4,276 square feet that he found. We're not going to tinker with the website's number. When measurements were made and accepted by parties operating at arm's length, we may rely on those figures in computing a proper price per square foot. See

[*20] <u>Learner v. Commissioner</u>, T.C. Memo. 1983-122, 45 T.C.M. (CCH) 922, 928 (1983).  We will use 4,276 square feet.

The parties also disagree about just how comparable the two buildings are. Blanding incorporated a number of factors to adjust the post office's rent per square foot downward, and we will take each in turn.  He first asserts that the age and condition of the post office, which was built in 1997 and remains in good condition, make it 20% more expensive than Plentywood Drug.  While the drug store is quite old, it was fully remodeled in 2004, so we do not find a 20% adjustment is appropriate.  Next is "Category Type."  Blanding's appraisal states that "retail construction cost tends to be lower due to its large open areas as opposed to apartment or office which have a higher level of interior finish."  He therefore gave Plentywood Drug a 25% discount as compared to the post office. McIvor disagrees, noting that the post office is a "shell" where they "move all their boxes and everything."  We again find Blanding's discount for this factor excessive.  The third factor is size, which accounts for "certain standard fixed costs in new construction, regardless of building size," which make smaller buildings more expensive per square foot.  Plentywood Drug is nearly twice as large as the post office, not including its basement, which we think makes Blanding's 5% adjustment for size reasonable.  But Blanding didn't consider one

[*21] factor relevant to rent costs: the certainty that the landlord will be paid. As McIvor--who is himself the owner of a property-management company--credibly testified, typical commercial property leases to private parties last two to five years; much shorter than the ten-year lease held by the post office in Plentywood. The government as a tenant is also far more likely than a private tenant to pay its rent in full and on time. This would likely lead a landlord to accept a lower rent for a property. On these facts, we find that these reasonable adjustments offset each other. We will use the $15.90 per square foot rent paid by the USPS, without any discount or premium, as the fair market rent for the main level of Plentywood Drug. Multiplied by 8,125 square feet, that means $129,187.50.

This leaves the 5,250 square feet of basement storage area. The Commissioner's expert did not include this 5,250 square feet when computing his rental value; he said instead that it increased the rental value of the main floor by 5% per square foot as compared to similar properties with no storage space. That equates to about $1.23 extra rent per square foot of basement. Plentywood Drug's expert estimated that it would have a value of $8 to $9 per square foot. He calculated this value at somewhat less than half the value of a comparable finished basement in Williston, which rented for $18 per square foot. We do find it much more likely than not that some value should be attached to this 5,250 square feet of

[*22] storage space, as it was used by Plentywood Drug for housing both inventory and its records.  See, e.g., Duplicating Supply Co. v. Commissioner, 66 T.C.M. (CCH) 853, 855 (1993) (finding value of storage space separate from retail space).  We also find that a fair rent for this space is lower than the retail space above it.  See id. ("Clearly, the retail and office space has more rental value than the storage space.")  While again acknowledging how thin the evidence is, we do find the rental value for the basement storage area estimated by Plentywood Drug's expert to be reasonable.  At $8 per square foot, a fair rent for the basement would be $42,000.

This puts the total fair market rent for the Plentywood Drug property at $171,187.50.  We will not adjust this figure year by year to reflect changes in the CPI.  We know that the Postal Service won a reduction in rent in 2008, and this suggests to us that the market fluctuations specific to real estate in Plentywood would overwhelm the effect of the low but steady inflation in prices of consumer goods and services throughout the entire national economy.

III.   Penalties

That leaves only the issue of penalties.  The Commissioner asserted that Plentywood Drug, the Manns, and the Eberlings owe accuracy-related penalties under section 6662(a), which imposes a 20% penalty on the portion of an

[*23] underpayment of tax that is attributable to any of the various causes listed in section 6662(b). The Commissioner alleges that the first cause on this list-- negligence or disregard of rules or regulations, sec. 6662(b)(1)--applies to Plentywood Drug, the Manns, and the Eberlings, but only Plentywood Drug's underpayment is also due to a substantial understatement of its income tax due, sec. 6662(b)(2). An understatement of a corporation's income tax is substantial if it exceeds the lesser of $10 million or "10 percent of the tax required to be shown on the return * * * (or, if greater, $10,000)." Sec. 6662(d)(1)(B).

We must also consider whether the Commissioner complied with section 6751. That section states that no penalty is allowed unless the "initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination." Sec. 6751(b)(1). This written approval must be obtained no later than the date the notice of deficiency is issued or the date the Commissioner files an answer or amended answer in which he asserts the penalty. Chai, 851 F.3d at 221; see also Graev, 149 T.C. at 493. There is an exception to the approval requirement for penalties "automatically calculated through electronic means." Sec. 6751(b)(2)(B).

[*24] No party produced any evidence that the Commissioner either did or didn't comply with the approval requirements of section 6751. Section 7491(c) places the burden of production on the Commissioner with respect to liability for any *individual* for any penalty. This means the Commissioner bears the burden of production with respect to the Manns' and the Eberlings' cases. The absence of any evidence means the Manns and the Eberlings have thrown off the penalties asserted against them, but what about Plentywood Drug? It's a corporation, so it bears the burden of production for its own case. NT, Inc. v. Commissioner, 126 T.C. 191, 195 (2006). When the burden lies on the Commissioner, we have held that he must introduce evidence that he complied with section 6751. See, e.g., Dynamo Holdings Ltd. P'ship v. Commissioner, 150 T.C. 224, 227 (2018); Higbee v. Commissioner, 116 T.C. 438, 446 (2001). When the burden lies on an estate or corporation or some other nonindividual, it must show that the Commissioner did *not* get supervisory approval. This is a somewhat unusual burden--the burden of producing evidence that no evidence exists of the Commissioner's compliance with his obligation to show supervisory approval of penalties. It can be met, for example, by asking for the penalty-approval form through a FOIA request or an informal discovery request and then showing that there wasn't one. Plentywood

**[\*25]** Drug didn't do that here, so it cannot take shelter from the penalties under section 6751.[10]

That also leaves Plentywood Drug to argue its way out of a penalty on the merits, which it can do in a couple ways. The first begins with our finding that the fair rent for all three years was $171,187.50. Plentywood Drug paid only $83,584 in 2011, meaning there was no excessive rent that led to an underpayment of tax that year. No penalty applies. In 2012 and 2013 Plentywood Drug did overpay its rent by about $20,000 and wrongfully claimed deductions on that overpayment. But the consequent underpayment of tax due is almost certainly less than $10,000, even with the several much smaller adjustments that Plentywood conceded.

Only the penalty for negligence remains. Taxpayers, both corporate and individual, can buck against the Commissioner's effort to saddle them with both negligence and substantial-understatement penalties if they can show their underpayments were due to reasonable cause and they acted in good faith. Sec. 6664(c)(1). We start out by noting just how difficult it was for the parties' professional appraisers to calculate a fair rent themselves. And while the methods

---

[10] The Commissioner argues that the penalty for substantial understatement of tax at section 6662(b)(2) falls within the automatic-computation exception to section 6751. Because Plentywood Drug is the only party alleged to have under-stated its income tax and failed to carry its burden of production for the section 6751 issue, the Commissioner's argument is moot and we will not address it.

**[*26]** the Eberlings and the Manns used to estimate what the rent should be were informal--they called up some shops in Plentywood and Williston and looked online for what little information was available there--they weren't all that different from what the appraisers used to collect their data. The rent they settled on wasn't far from what we've found is fair, either. We therefore find that they acted on behalf of their corporation in a reasonable way and reached a reasonable result in good faith. See Estate of Thompson v. Commissioner, 88 T.C.M. (CCH) 48, 64-65 (2004) (stock valuation in good faith where no comparable companies and "difficult judgment calls" led taxpayer to valuation closer to Court's than Commissioner's), vacated and remanded, 499 F.3d 129 (2d Cir. 2007).

No penalties apply, and

Decisions will be entered under Rule 155.