PAUL W. LEARNER AND KATHRYN LEARNER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Learner v. Commissioner
Docket No. 4355-80
United States Tax Court
T.C. Memo 1983-122; 1983 Tax Ct. Memo LEXIS 662; 45 T.C.M. (CCH) 922; T.C.M. (RIA) 83122; March 9, 1983. Jay R. Oliff, for the petitioners. Elizabeth I. Abreu, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge:* Respondent determined a deficiency of $184,863 in petitioners' 1976 Federal income tax. Due to concessions by both parties, *663 the issues remaining for our decision are: (1) the fair market value of an office building and real property located in Eureka, California as of March 19, 1976; (2) the fair market value of shares in a closely-held corporation as of December 1976; and (3) the characterization of certain fees, which petitioners paid for legal opinions and assistance, as ordinary expenses or capital expenditures. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation and exhibits attached thereto are incorporated herein by this reference. Paul W. Learner and Kathryn Learner resided in Piedmont, California, when they filed their petition herein. Kathryn Learner is a party solely because her signature appears on the joint return. Thus, any references hereinafter to "petitioner" shall refer to Paul W. Learner. The issues in this case arise from petitioner's ownership and subsequent disposition of shares in several corporations. Because the resolution of *664 each issue depends upon facts which are unrelated to the other issues, we will find separately the facts relevant to each issue. Valuing Eureka Land
On January 1, 1976, petitioner owned 100 percent of the outstanding stock in The Learner Company and in Learner Investment Company. Petitioner, The Learner Company, [1] and Learner Investment Company together owned 100 percent of Learner-Eureka, Inc. Their respective shareholdings in Learner-Eureka, Inc., were as follows: Shareholders
Shares
Percent
The Learner Company
50
48.54
Learner Investment
Company
51
49.52
Paul Learner
2
1.94
103
100.00
On April 13, 1976, petitioner purchased all Learner-Eureka, Inc. shares held by The Learner Company and Learner Investment Company. Thus, petitioner became the sole owner of Learner-Eureka, Inc. [2]
At the time petitioner acquired Learner-Eureka, Inc., the company's *665 principal asset was an office building and real property located at 619 Second Street, Eureka, California (hereinafter sometimes referred to as the Second Street property or 619 Second Street). The book value of the building, at least as of March 19, 1976, [3] was $119,058. The building was occupied by agencies of the State of California under a lease agreement effective from August 1, 1969 to July 31, 1979. The Second Street property was located in the commercial waterfront district of Eureka, near Humboldt Bay. This district was Eureka's oldest developed area. By 1976, it had become run down, and was no longer a desirable commercial location. At that time, the central commercial area of Eureka was approximately four blocks away from the waterfront district and the Humboldt County Court House was approximately five blocks away. The Second Street property occupied an entire city block. It was bounded by First Street *666 on the north, Second Street on the south, H Street on the east, and G Street on the west. In 1976, its immediate surroundings were not attractive. A large scrap yard lay to the north, across First Street. Railroad tracks ran down the middle of First Street. A vacant lot lay to the east. Other neighbors included a former hotel and a warehouse. However, due to the efforts of the Eureka Redevelopment Agency, the area was beginning to improve somewhat. During 1976, the agency commenced projects to resurface Second Street and to renovate sidewalks in the vicinity of the subject property. This work was completed in 1978. The 619 Second Street property was divided into two parcels of 26,400 square feet by an alley running east and west. Half of the northern parcel was covered by a parking lot enclosed by a chain link fence. The other half was vacant and unimproved. The southern parcel was covered by the office building. Learner-Eureka, Inc. built the office building in 1958 for lease to the State of California. Various state agencies occupied the building from 1959 up to the time of trial. The building contained 10,455 net square feet of office and laboratory space; 300 *667 net square feet of enclosed space; 4,635 net square feet of basement storage space; and 5,076 net square feet of basement parking space. In addition, the parking lot on the northern parcel which could be leased contained sixty-one spaces. When petitioner acquired Learner-Eureka, Inc., the Second Street property, excluding the vacant lot, was subject to a lease with the State of California. The lease had three years and four months left to run. [4] It produced a gross monthly rent of $3,554.90. Including taxes, the monthly expenses of operating the property totalled approximately $1,947.39. [5] Thus, the Second Street property generated net monthly income of $1,607.51. In addition, the vacant lot was worth $2.00 per square foot, or $26,400 in total. On *668 September 23, 1976 Learner-Eureka, Inc. entered into an agreement to transfer the Second Street property to George Rynecki. The agreement was structured as a like-kind, tax-free exchange under section 1031. [6] It valued the Second Street property at $260,000. The actual transfer pursuant to the agreement did not occur until January 26, 1977. At the time Rynecki acquired 619 Second Street, the property was run-down. He immediately spent approximately $50,000 to repair and improve the property so that it could continue to be used. He paid for a new roof, replaced some floor coverings, placed a fence around the parking lot, painted the building inside and out, and had some landscaping done. Respondent initially determined the fair market value of 619 Second Street to be $260,000 as of March 19, 1976. By amended answer, submitted shortly before trial, he increased the valuation to $385,000. Petitioner's expert found the fair market value of 619 Second Street to be $119,500 as of March 19, 1976. Because respondent determined that the fair market value of the Second Street property *669 as of March 19, 1976 far exceeded its book value, he concluded that petitioner had made a bargain purchase of the Learner-Eureka, Inc. stock. He reasoned that since 619 Second Street was the sole asset of Learner-Eureka, Inc., the value of the corporation's stock was equivalent to the value of its sole asset and determined that petitioner had received a dividend to the extent that such value exceeded the amount paid for the stock. 6a Petitioner disagreed with respondent based upon the value of 619 Second Street. The best method for valuing the Second Street property was the income approach. This method assumed that the property was purchased for its expected ability to produce an income stream over a period of years. Both respondent's expert and petitioner's expert valued the Second Street property using the income approach. The income approach required determination of the 619 Second Street property's *670 economic rent and selection of an appropriate capitalization rate for its sale. For purposes of determining an economic rent, there were a few other office buildings in Eureka to which the subject property could be compared. The office buildings in Eureka had a three to five percent vacancy rate at that time. For purposes of determining an appropriate capitalization rate, there were also a few other building sales to which the property could be compared. First, pertinent to the calculation of an economic rent, there were four office buildings of prime quality located near the Humboldt County Court House.Their space was leased on a gross rent basis. These buildings commanded rents of $ .44, $ .49, $ .50 and $ .56 per net square foot. The rents included full servicing and tenant parking. In one of the buildings, 555 H Street, the expenses of servicing and operation equalled seventeen percent of the gross rent. Thus, that building's net rent equalled eighty-three percent of its gross rent. The record does not show the net rents on the other three comparables. Another office building, located near the Eureka City Hall (which was two blocks farther from the waterfront district *671 than the Court House), also was leased on a gross basis. Its gross rent, per net square foot, was $ .45, fully serviced. Petitioner's expert used these five buildings to arrive at an economic rent for 619 Second Street. The record also shows three other office buildings located in Eureka which could be used as comparables to determine an economic rent for the Second Street property during 1976. In these buildings, the tenant assumed most of the costs of servicing and operation. However, some of the costs were paid by the landlord. Thus, the buildings were rented on a partly net and partly gross lease basis. One building was located in an industrial district of Eureka. It rented for $ .41 per gross square foot. [7] The landlord assumed responsibility for all repairs over $1,000. Another building had been a milk processing plant, and then a TV studio, before it was converted into office space. It rented for $ .29 per gross square foot. Insurance and taxes were paid by the landlord. The third property had originally been an automobile dealership. The gross rent on this property was $ .50 per gross square foot, while the net rent was $ .30 per square foot, or 60 percent *672 of gross. Respondent's expert used the rents on these properties, and the building at 555 H Street, to arrive at an economic rent for the Second Street property. The building at 619 Second Street had 4,635 net square feet of basement storage space available for lease. During 1976, storage space in Eureka rented on a gross basis at about $ .11 per net square foot. Second, for purposes of determining an appropriate capitalization rate on the sale of the Second Street property, there were sales of three buildings in Eureka, and one in the nearby community of Fortuna, to which the Second Street property could be compared. One sale occurred in Eureka's central commercial district on June 1, 1976. The tenant was J.C. Penney, Inc., which rented the premises under a lease with five years remaining, and which had the option to terminate the lease after 12 months written notice. The capitalization rate on the sale was 11.5 *673 percent. Another sale occurred in the summer of 1977. This property was located across the street from the J.C. Penney, Inc. store, and was composed of a group of small stores. The capitalization rate on this sale was 9.6 percent. A third sale occurred on January 5, 1976. The property was located eleven city blocks away from Second Street in a section of Eureka zoned "Service Commercial." Two buildings, one metal and one wood, were located on the property. They were in poor condition. The record is not clear whether these buildings were used as warehouses, as offices, or for some other purpose. The capitalization rate on the sale was 15.2 percent. [8] The fourth sale involved a building located a considerable distance from 619 Second Street. The property, a Purity Store, was located about eighteen miles south of Eureka in the community of Fortuna. The record does not show when this sale occurred. Three years remained on the existing lease, with no assurance that the building would be occupied after the end of that time. The capitalization rate on the sale was 10 percent. *674 Valuation of Pacific States Steel Corporation
Pacific States Steel Corporation (PSSC) was a closelyheld corporation founded in 1888 by Joseph Eastwood, Sr. The company had three major lines of business, including steel production, fabrication of reinforcing steel for construction, and production of ingots and forgings on a specific order basis. PSSC produced steel in four open-hearth furnaces which had been installed between 1947 and 1956. However, by 1976, open-hearth furnaces were rapidly becoming obsolete. Thus, for PSSC to continue operation it needed to replace and modernize its production methods. PSSC did not modernize, but instead ceased its steel production business at the end of October 1978. The book value of PSSC's shareholders' equity was $12,178,718 as of March 31, 1976, and $10,749,655 as of March 31, 1977. However, the fair market value of PSSC's inventory exceeded its cost by $2,129,014 and $2,593,924 as of March 31, 1976 and 1977, respectively. In addition, the fair market value of a 95 acre parcel of land owned by PSSC exceeded its $875,146 cost. In 1974, an inferior, 26.81 acre parcel of land had a fair market value of $25,000 per acre. The remaining *675 69-odd acres had a fair market value of at least $25,000 per acre. There is some evidence that this property appreciated in value between 1974 and 1976. However, no expert opinion was presented as to the magnitude of any such appreciation. Finally, PSSC's financial statement reflected a cash reserve for furnace rebricking of $550,000 as of March 31, 1976, and $335,000 as of March 31, 1976. Had the after-tax value of this reserve been added to the shareholders' equity, it would have equalled $261,000 as of March 31, 1976, or $159,125 as of March 31, 1977. [9]
In May 1975, some minority shareholders brought suit against certain of PSSC's officers and directors, including its president, Mr. Joseph Eastwood, III. The suit apparently included a derivative claim on behalf of the company, as well as individual actions against the defendant management. Part of the relief sought was an involuntary winding up and dissolution of PSSC. The minority shareholders believed that PSSC's balance sheet understated the value of its underlying assets and thought that PSSC would be worth more liquidated than *676 operated as a going concern. Glenn Wilson, one of the minority shareholders involved in the suit, gave some of his PSSC shares to charity and some to his children in 1975 and 1976. He valued the 1975 dispositions at $17.85 per share, and the 1976 dispositions at $13.50 per share. Joseph Eastwood, III, the majority shareholder of PSSC, believed that his PSSC stock would have been worth between $14 to $16 in December 1976. Although he had purchased about 15,000 of his PSSC shares in 1971 for 55 cents per share, this purchase was made under special circumstances. The stock was held by a bank as collateral for a loan. When the debtor defaulted, the bank offered the shares to Mr. Eastwood for the unpaid amount of the loan. Petitioner purchased 22,500 PSSC shares in 1962 from the estate of an Eastwood family member. Petitioner later transferred 17,000 of the shares to his two daughters, but retained the remaining 5,500 shares. Petitioner's 5,500 share interest comprised 0.58 percent of the 950,000 outstanding PSSC shares. Petitioner donated his 5,500 PSSC shares to Alta Bates Foundation in December 1976. On his 1976 income tax return, he valued the shares at $15 each. Accordingly, *677 he deducted $82,500 for his contribution. Respondent, in his notice of deficiency, valued the PSSC stock at $8 per share, and disallowed $38,500 of petitioner's deduction. Later, by amended answer, respondent determined an increased deficiency in petitioner's taxes. This increase was based in part on a lower valuation for the PSSC stock of $2.70 per share, and in part on an increased valuation of the Second Street property in Eureka, discussed above. Petitioner's expert, Leland D. Levy, prepared a report on the fair market value of PSSC stock as of December 1976.He determined that the PSSC stock was worth $15 per share.
Legal Fees
During 1976, petitioner paid various fees to attorneys and accountants. In particular, he paid $25,000 to the law firm of Glicksberg, Kushner & Goldberg. This payment was made pursuant to the following bill: Re: Sale of Paul Learner Stock in Learner Company, Flynn-Learner and Learner Investment Company For legal services in connecting with tax and business matters rendered in the sale of stock of Paul W. Learner in the following corporations to Hugo Neu Corporation: The Learner Company, Flynn-Learner, Learner Investment Company Said services of every kind and character, but not
limited to, including consultations with principals,
attorneys and accountants; research of legal
problems of every kind and character. Said services
extended over a period of three months.
Total time in excess of 220 hours.
$20,000.00
Additional services consisting of drafting and
reviewing agreements of every kind and character,
including bills of sale, indemnification agreements,
minutes and deeds.
Total time in excess of 55 hours.
$ 5,000.00
$25,000.00
*678 The record contains no further evidence concerning this bill, or the services for which it was rendered. OPINION Fair market value is the price at which property will change hands between a willing buyer and seller, after negotiation, neither being under any compulsion to buy or sell, and both having reasonable knowledge of the relevant facts. See, e.g., section 1.170A-1(c)(2), Income Tax Regs. In general, respondent's determination of value is presumptively correct, and petitioner has the burden of proving otherwise. Rule 142(a). [10] However, when respondent pleads an increased deficiency in his answer, he has the burden of proof with respect to the increase. Rule 142(a). In this case, respondent pleaded an increased deficiency in his amended answer based upon an increase in his initial valuation of the Second Street property and a decrease in his initial valuation of the Pacific States Steel Corporation stock. Thus, respondent has the burden of proving the values of these properties to the extent they differ from the values determined by him in his notice of deficiency. *679 Valuation of Eureka Property
Respondent's expert and petitioner's expert used the income approach to value the Second Street property located in Eureka, California. This approach assumes that property is purchased for its capacity to produce a stream of income over a period of years.The projected yearly income stream of the property is capitalized by an interest factor, called the "capitalization rate." Among other considerations, this factor accounts for the cost of money and the risk that the property will fail to produce the projected income stream. The greater the risk perceived to be associated with a given income stream, the higher the capitalization rate, and the lower the fair market value of the property. Using the income approach, respondent's expert valued 619 Second Street at $385,000, and petitioner's expert valued it at $119,500. These discrepant valuations arose because the experts selected different capitalization rates and projected different yearly income streams. [11]
*680 The income approach is an appropriate method to use in valuing commercial rental property with a 25-year remaining useful life. However, we disagree with some assumptions made by both experts in their determinations of a projected rental value for the Second Street property and a proper capitalization rate for its sale.Moreover, we disagree with certain adjustments made to the final valuation by petitioner's expert which reflected the cost of converting the property to multi-tenant use. (a) Selection of a Capitalization Rate
First, we find that the capitalization rate of 10 percent selected by respondent's expert was too low. Respondent's expert relied primarily upon the sale of a property in Fortuna to establish his capitalization rate. However, this property was a store, [12] not an office building. It was located about eighteen miles from 619 Second Street. It was in a community smaller than Eureka. These factors suggest that its sale, at a 10 percent capitalization rate, was not comparable to the sale of 619 Second Street. The second sale which respondent's expert relied upon was of property located approximately twenty-seven blocks south of 619 Second Street. The *681 record does not show what type of property this was, the condition it was in, nor the area in which it was located. Thus, there is insufficient evidence for us to consider this property as comparable. The third property was located near the subject property, in the central commercial district of Eureka. It was a building comprised of a series of small stores. It had been constructed by the tenants to suit their own needs. This was purchased based on a capitalization rate of 9.6 percent. Petitioner's expert used two Eureka properties to establish a 12 percent capitalization rate. One property was a J. C. Penney store located across the street from respondent's third comparable. Like the Fortuna property, this property was a store, not an office building. It was sold at a capitalization rate of 11.5 percent.The second property was located near the western waterfront of Eureka. It had two buildings in poor condition on it. The record does not show for what purposes the buildings were used. This property sold at a capitalization *682 rate of 15.2 percent. The evidence presented by petitioner and respondent with regard to the appropriate capitalization rate for the Second Street property covers a wide range of values, from 9.6 percent to 15.2 percent. Apparently, no sales of other waterfront area office buildings occurred during the year in issue. The sales located closest to the subject property had capitalization rates of 9.6 percent and 11.5 percent.However, these properties were located in a better area than 619 Second Street. Based upon the sketchy record before us, we find that 12 percent is the appropriate capitalization rate for determining the fair market value of the Second Street property. (b) Valuing the Leasehold Reversion
The second major valuation criterion upon which petitioner and respondent disagree is the projected future net income stream of the Second Street property. Petitioner's expert approximates this stream at $2,012 per month, while respondent's expert's value is $3,750. These values were arrived at based upon different assumptions. First, petitioner's expert measured the floor space of 619 Second Street on a net square foot basis. Respondent's expert measured the *683 space on a gross square foot basis. Because net office space equals approximately 80 percent of gross office space, petitioner's and respondent's usable office space figures were very close. [13] However, petitioner's expert derived his figures from measurements which were made prior to the litigation involved herein, and which were accepted by parties operating at arm's length. [14] Thus, we rely on his figures to find that 619 Second Street had 10,455 net square feet of usable office space, 4,935 net square feet of storage space, and 30 open parking spaces. Second, when computing the appropriate monthly rentals of 619 Second Street, petitioner's expert included the storage space and the parking spaces as separate rentable areas. Respondent's expert did not include these areas. The parking areas should not have been separately considered. The comparables used by petitioner's expert, and some of the comparables used by *684 respondent's expert, included tenant parking as part of the office rental price. We have seen no evidence sufficient to indicate that the parking areas at 619 Second Street should be treated differently. However, petitioner's expert properly treated the storage space as a separate, rentable portion of 619 Second Street. This area was apart from the office space and was not included in either parties' measurement of gross or net office space. It constituted an independently useful portion of the Second Street property. Moreover, nothing on the record suggests that similar storage space was included in the rental prices of the comparable office buildings. In the absence of contradictory evidence, we find that petitioner's computations properly included net rentable storage space. The third, and most significant factor upon which petitioner's and respondent's experts' computations of economic rent rests, is their selection of an appropriate monthly rental per square foot of office space. It is difficult to compare petitioner's and respondent's figures because petitioner's expert measured monthly rents based on net floor space, while respondent's expert measured monthly rents *685 based on gross floor space. For purposes of uniformity and convenience in comparing the rents, we have converted respondent's expert's rent comparables from gross square footage rents to net square footage rents using respondent's expert's estimate that net floor space equals about eighty percent of gross floor space. On this basis, respondent's expert's rent comparables were $ .23, $ .24, $ .33 and $ .40 per net square foot. It is also difficult to compare the economic rent figures appearing in the expert's reports because gross monthly rents, net monthly rents, and partlynet monthly rents are used. Again, for purposes of uniformity and convenience, we have converted the gross rent figures to net rent figures. Converting gross rent to economic rent involves reducing total possible gross rent by anticipated loss of gross rent due to vacancy and by expenses of operation, maintenance and taxes. Petitioner contends that a five percent adjustment for expected vacancy is proper, and that a fifty-five percent adjustment for operational expenses and taxes is proper. We find these adjustments to be excessive. The average vacancy rate for office buildings in *686 Eureka ranged between three and five percent in 1976. The Second Street property was not in the most desirable section of the city. However, vacancy rates in the waterfront district were the same as in the downtown central commercial district. In addition, the Second Street property was completely occupied as of the March 19, 1976 valuation date. Although there was a possibility that the existing tenants would vacate the premises at the end of the lease, this possibility was speculative. Given these factors, we find that the vacancy rate at 619 Second Street could be expected to be about three percent, thus falling at the lower end of Eureka's average vacancy rate. We also find excessive petitioner's reduction of gross rent by fifty-five percent for maintenance, operations and taxes. Petitioner's expert derived this percentage from the actual expense of operating 619 Second Street in 1976. However, at that time, the lease encumbering the property was a poor one because expenses consumed a high percentage of the gross income it produced. When a new lease was entered in 1979, it was on much more favorable terms. Two other office buildings in Eureka also had much lower operating *687 expenses, equalling forty percent and twenty-seven percent of gross rent. These factors indicate that expenses equal to fifty-five percent of gross rent are excessive for determining the economic net rent of 619 Second Street.We find that reasonable and expected operating expenses should be estimated at forth percent of economic gross rent.Thus, including a factor for three percent vacancy, the comparables which were stated in gross rent terms bore net rents of $0.25, $0.28, $0.29, $ .32 and $ .26 per net square foot. Unfortunately, the rents given for two of the comparables are stated in terms which are neither net nor gross. One building rented for $ .41 per gross square foot, with the landlord paying only those expenses which exceeded $1,000. The other building rented for $ .29 per gross square foot, with the landlord paying only its insurance and taxes. There is no evidence as to insurance costs, taxes or expenses exceeding $1,000 on which we might rely to convert these partly net rent figures into completely net or gross terms. Thus, there is no common basis on which we can compare these rents to the other rents prevailing in Eureka during 1976. Accordingly, we will disregard *688 them for purposes of determining the economic rent of 619 Second Street. After considering the evidence before us, we find that the appropriate economic net rent of 619 Second Street was $ .30 per net square foot per month. In addition, the economic net rent for the storage space was $ .06 per net square foot per month. Thus, the total economic net rent of the 10,455 net square feet of office space and 4,935 net square feet of storage space at 619 Second Street was $3,432.60 per month, or $41,191 annually.This annual income stream, capitalized at 12 percent, yields a fair market value of $343,258 for the Second Street property, as of March 19, 1976. [15] However, because this income stream could not be obtained until 40 months after the valuation date, when the existing lease expired, it must be discounted. Accordingly, the present discounted value of the leasehold reversion as of March 19, 1976 was $230,532. (c) Valuing the Existing Lease and Vacant Lot
The parties agree that the fair market value of the vacant portion of the northern parcel of 619 Second *689 Street was $2.00 per square foot. Based on a lot size of 13,200 square feet, the vacant land had a fair market value of $26,400. The parties also agree that the net monthly rent income of the existing lease was $1,607.51. Based on a remaining term of 40 months, and a capitalization rate of 12 percent, the existing lease had a fair market value of $52,782. Thus, the combined fair market value of the lease and the vacant lot was $79,182. (d) Repairs and Multi-tenant Usage
Petitioner contends that, regardless of the fair market value of 619 Second Street, $95,000 must be subtracted for the cost of repair work and for converting the property to multitenant usage. In particular, he claims that as of March 19, 1976, the property needed $50,000 of repair work done. Moreover, he maintains that a prospective purchaser would have expected the State of California to vacate the property at the end of the existing lease. This, he insists, would necessitate $45,000 worth of changes to accomodate other tenants. We agree that the repair cost was necessary, but disagree on the need for conversion. The property needed substantial repairs in 1976. It had not been well-maintained during *690 the years following its construction. In fact, there was some question as to whether it could continue to be occupied. Shortly after George Rynecki acquired the property, he spent over $50,000 to repair it. This included putting on a new roof, replacing some floor coverings, painting the structure inside and out, and landscaping overgrown areas. Respondent contends that these costs were for deferred maintenance. He asserts that they should be capitalized, rather than deducted currently from the price of the property. We do not agree. The repairs were necessary to continued use of the building. They had to be made, either to retain the existing tenants or to attract new ones. Moreover, the repairs were paid in 1976 or 1977 dollars. [16] Although the benefit of the repairs was to last longer than the year in which they were made for purposes of tax accounting, the cost was a current one to potential buyers and thus affected the price a buyer was willing to pay for the property before improvement. A property in need of repair will not produce the income stream of a comparable, well-maintained building unless it is repaired. Thus, the fair market value of 619 Second Street *691 should be lowered by $50,000 to account for the necessary repairs. [17]
We think a similar deduction from fair market value, for the expected costs of converting 619 Second Street to multi-tenant occupancy, is inappropriate. There is scant evidence that the State of California contemplated vacating 619 Second Street. The cover letter for the lease which took effect in 1979 makes a brief reference to "trying circumstances" in bringing the lease to conclusion. However, the nature and extent of those circumstances were not discussed. Moreover, the actual lease, to which the letter referred, was completed in August 1978, a full year before the old lease expired and the new one took effect. These facts suggest that the State was not seriously looking for a new building. This conclusion is strengthened by the fact that the building was originally built for the State. Even if the State was considering vacating 619 Second Street at the end of the lease, the evidence does *692 not show that their consideration had risen to the level of decision or certainty.Accordingly, we conclude that the value of 619 Second Street should not be adjusted to reflect the costs of converting to multi-tenant usage. (e) Fair Market Value of 619 Second Street
Based upon the facts and events discussed above, we find that the fair market value of 619 Second Street on March 19, 1976 was $259,714. This includes the value of the vacant land ($26,400), the value of the existing lease ($52,782), and the value of the leasehold reversion ($230,532), less the cost of repairs ($50,000). Valuation of Pacific States Steel Corporation Stock
Petitioner argues that his 5,500 shares of PSSC had a fair market value of $15 each in December, 1976, when he contributed them to Alta Bates Foundation. For support, he relies upon an expert report and upon testimonial evidence. Petitioner has the burden of showing that the value of the PSSC shares exceeded the $8 per share valuation which respondent determined in his notice of deficiency. Rule 142(a). Respondent argues that the 5,500 PSSC shares had a fair market value of $2.70 each in December 1976. For support, he relies upon *693 an expert report. In his amended answer, he alleged an increased deficiency based upon the PSSC share valuation set forth in the expert's report. Respondent has the burden of showing that the fair market value of the PSSC shares was less than the $8 value which he determined in his notice of deficiency. Rule 142(a). Petitioner's expert used the liquidation approach to value petitioner's PSSC shares. This valuation method assumes that shareholder equity in a company is worth more as a collection of cash and assets than it is as a going concern.In effect, the method assumes that a company is a candidate for liquidation and that the company's shares are no more valuable than its underlying assets. Respondent contends that a liquidation valuation is improper because petitioner's PSSC shares represented a minority interest and, as such, could not force liquidation. Instead, respondent maintains that the value of petitioner's PSSC shares is properly determined by comparing PSSC to other companies. We find that a liquidation valuation is an appropriate method by which to value petitioner's PSSC shares. While respondent accurately observes that a minority interest, such as petitioner's, *694 could not force a liquidation, this does not imply that only majority interests can be valued using a liquidation basis. When there are reasonable prospects that a company will be liquidated, a minority interest can properly be valued with reference to anticipated liquidation proceeds. In 1976, reasonable prospects existed that PSSC would be liquidated. A shareholder's derivative suit had been filed in May 1975 on behalf of PSSC by some of PSSC's minority shareholders. At the same time, individual actions were instituted against certain of PSSC's officers and directors. The derivative suit sought, among other things, dissolution of PSSC and distribution of the proceeds. The suit was filed because the minority shareholders believed that PSSC's assets would be more valuable if they were distributed than if they continued to be operated as a going concern. In addition, as respondent's expert stresses, the United States steel industry was depressed in 1976. Particularly hard-hit were companies, such as PSSC, which relied on outdated technology to produce their steel. PSSC needed to replace and modernize its steel-making methods to continue operating. In fact, during the year *695 ending December 31, 1976, PSSC paid no dividends and had losses of $370,000. Then, in 1978, PSSC formally gave notice to its union that it would stop operations effective October 1978. These factors do not suggest that PSSC was a going concern without any prospect of liquidating. To the contrary, in December 1976 the company was having difficulties in every way, including management problems, marketing problems, and production problems. The discontinuance of plant operations, after the valuation date, corroborates the uncertain health of PSSC on the valuation date. [18] On this record, we conclude that the liquidation valuation method was an appropriate method by which to value petitioner's PSSC shares. Respondent next argues that petitioner's expert overvalued the shareholders' equity in PSSC as of December 1976, even if the liquidation method was an appropriate method by which to value PSSC's shares. Respondent first claims that petitioner's expert valued the PSSC shares as of March 1976, *696 rather than December 1976. He also insists that petitioner's expert overvalued PSSC's land. Finally, he contends that petitioner's expert failed properly to account for certain of PSSC's liabilities. We agree that certain of petitioner's expert's computations are inaccurate. First, the petitioner's expert relied on the figures from an independent auditor's financial report for the year ending March 31, 1976. However, petitioner donated his shares to Alta Bates in December 1976. Respondent argues that petitioner's expert should have used certain unaudited financial statements for the month of December 1976, compiled by PSSC for internal company use, instead of the audited figures. The unaudited financial statements of December 1976 introduced by respondent were not shown to be reliable. They were obtained from a PSSC employee who did not work for the company when the records had been compiled. There is no evidence that the records were made using generally accepted accounting principles, or to indicate the purposes for which the reports were made or used. We do not believe that petitioner's expert should have used these materials in completing his valuation. We nonetheless *697 observe that an independently audited financial statement for the period ending March 31, 1977 was available for purposes of computing the liquidation valuation of PSSC. This report does not suffer from the hazards of unreliability discussed above. In addition, it stated PSSC's financial condition as a product of the company's operations in the months following March 1976, thus including PSSC's condition in December 1976, which the March 31, 1976 financial statement did not. Also, the 1977 statement reported PSSC's financial position only 3 months after petitioner donated his shares to Alta Bates, while the 1976 statement reported PSSC's financial position more than 7 months before the donation. We find that petitioner's expert should have computed PSSC's liquidation valuation using data from the March 31, 1977 financial statement. Second, we address respondent's contention that petitioner's expert overvalued PSSC's land holdings at $33,000 per acre. Petitioner's expert based his valuation on the 1974 report of a real estate appraiser which was received in evidence without objection and which indicated that a 26.81 acre parcel of PSSC's land was worth $25,000 per acre. Petitioner's *698 expert assumed that the entire 95 acres owned by PSSC was worth at least $25,000 per acre in 1974 based upon the real estate appraiser's trial testimony. Then, he assumed that the property had appreciated between 1974 and 1976 and $33,000 per acre. Respondent argues that petitioner's expert improperly inferred that all 95 acres were worth $25,000 per acre and improperly assumed that the property had appreciated to $33,000 per acre by 1976. It is clear that the 95 acres were worth at least $25,000 per acre in 1974. The real estate appraiser, who valued a 26.81 parcel of PSSC's land, stated at trial that the parcel was inferior to the larger parcel of PSSC's land. He thought that the larger parcel was worth at least as much per acre as the smaller parcel.He was a well-qualified expert, and respondent did not challenge his expertise or his report. We are satisfied with his evaluation, and will rely upon it. Petitioner's expert adjusted the real estate appraiser's valuation from $25,000 to $33,000 per acre to account for appreciation occurring between 1974 and 1976. There is evidence that PSSC's land increased in value during this time period. However, there is no reliable *699 evidence as to the magnitude of the increase. We cannot accept petitioner's expert's adjustment because he was not an expert for purposes of real estate appraisal. Thus, we find that PSSC's 95 acres should have been valued at $25,000 per acre, rather than $33,000 per acre, for purposes of the liquidation valuation. Finally, respondent claims that petitioner's expert's report failed properly to account for PSSC's liabilities, such as an antitrust suit in which PSSC was named a defendant, pension plan liabilities, the tax consequences of the presence of a DISC, and the probable costs of liquidation. Petitioner denies that an adjustment for the cost of liquidation is necessary. We do not agree.
The liquidation method of valuation assumes that shares in a company are worth a proportionate part of the company's underlying assets. However, the costs associated with the process of liquidation reduce the anticipated proceeds of liquidation. Thus, it is proper to adjust the value of the shares for the cost of liquidation. There is no evidence in the record which might suggest an appropriate discount for such costs. We note that liquidation costs are somewhat analogous to the costs *700 of creating a market for a minority interest in the company. Respondent's expert estimated a twenty percent discount for the cost of marketing such an interest. In the absence of any showing by petitioner that a lesser discount is proper, we will adopt a twenty percent discount for liquidation costs. In sum, we conclude that petitioner's expert properly valued petitioner's PSSC shares based on their underlying asset, or equity, value. However, we also find that petitioner's expert overvalued PSSC's land, used untimely financial statements, and failed to account for the cost of liquidating the company. After making adjustments for those factors, we find that the 5,500 PSSC shares had a fair market value of $12.24 per share as of December 1976. Implicit in our finding that petitioner sustained his burden of proving that the PSSC shares were worth more than $8 each, as determined in respondent's notice of deficiency, is the finding that respondent failed to sustain his burden of proving that the shares were worth less than $8 each. The expert report on which respondent relied was deficient for two reasons. First, respondent's expert determined a value for PSSC's shares by *701 comparing PSSC to five other steel companies. However, the record does not show that PSSC compared with these other companies. The five comparison companies operated in limited geographical markets. The record does not show the type of geographical market in which PSSC operated. Four of the comparison companies were located east of the Mississippi River, and one was located in Missouri. PSSC was located west of the Rocky Mountains, in Northern California. Several of respondent's comparison companies had limited product lines, such as rings for aircraft, or reinforcements for construction use. PSSC had three major lines of business, including steel production, construction projects, and forging for specific customer requirements. Finally, the comparison companies' revenues ranged between $55,000,000 and $151,000,000 per year, with three having revenues greater than $100,000,000 annually. PSSC's revenues in 1976 were about $37,500,000.
The report of respondent's expert is also insufficient to sustain respondent's burden of proof because it applied improperly a regression analysis to establish a value for the PSSC shares. (A regression analysis is a quantitative, statistical *702 computation which estimates a relationship between the data points being analyzed.) First, the expert report only used three companies for statistical comparison with PSSC.(Two of the five comparison companies were not used because they supposedly had institutional investors.) Under the circumstances of this case, three data points are not a sufficient sample on which to make a reliable quantitative analysis. [19] Second, respondent's expert compared two ratios on the companies' operations without explaining the reason for which they were chosen. In particular, he compared the price/book value measurements of the three selected companies to their weighted average earnings/share/book value/share. Without any explanation for why these particular ratios were related, we are unable to conclude that the regression line which results from comparing them is relevant or reliable in determining PSSC's price per share. [20]
*703 Finally, it appears that the ratios compared in respondent's expert's report could be reduced to a comparison of price per share to earnings per share. [21] Unlike the ratios set forth in the expert report, price/earnings ratios bear a well-recognized relationship in the valuation of companies. [22] However, the price/earnings ratios of publicly-held companies do not compare to the price/earnings ratios of a closely-held company if the companies themselves are not comparable. Whether the stock price of one company with a given earnings stream will be similar to that of another company with the same earnings depends upon a wide variety of factors, including management policy, management ability, past performance, and dividend policy. [23] As we have discussed, the record does not demonstrate that the companies chosen by respondent's expert were, in fact, comparable to PSSC. *704 Based on the problems discussed above, respondent has failed to sustain his burden of proving that petitioner's PSSC shares were worth less than $8 each, as determined in his notice of deficiency.Instead, petitioner has sustained his burden of proving that PSSC's shares were worth more than $8 each, and has proved a value of $12.24 per share. Thus, respondent's determination of deficiency, due to petitioner's deduction of $15 per share for his charitable contribution of the PSSC shares, will not be sustained to the extent of $4.24 per share, or $23,320. Legal Fees
Section 212 provides that ordinary and necessary expenses paid for the production, management or conservation of income-producing property, or paid for tax advice, may be deducted during the taxable year in which paid or incurred. However, section 212 does not authorize the deduction of costs which would otherwise be capitalized. Section 1.212-1(n), Income Tax Regs. Legal fees which are incurred in the acquisition or disposition of capital assets are capital expenditures which accordingly may not be deducted under section 212 as ordinary expenses. Woodward v. Commissioner,397 U.S. 572 (1970); *705 Soelling v. Commissioner,70 T.C. 1052 (1978). During 1976, petitioners paid $27,681.04 in legal fees to the law firm of Glicksberg, Kushner & Goldberg. Petitioner argues that $25,000 of the fee was for investment advice concerning his stock in The Learner Company, Flynn-Learner, and the Learner Investment Company.He contends that the advice he received with respect to the stock related primarily to the management of his investment, and to related tax matters. He insists that any advice received on the sale of the stock to Hugo Neu and Sons, Inc. was merely incidental to general business and tax advice received. In contrast, respondent contends that the advice from the Glicksberg law firm related primarily to petitioner's sale of his stock in the aforementioned companies to Hugo Neu and Sons, Inc. The issue before us is whether the $25,000 legal fee paid by petitioner related generally to investment and tax advice, or specifically to the disposition of stock, a capital asset. We note that when specific legal advice is given, the result of which is an acquisition or disposition of capital assets, the fees paid for that advice are usually considered to be capital *706 expenditures. For instance, in Rushing v. Commissioner,58 T.C. 996 (1972), the taxpayer hired a CPA firm to assist in negotiations which eventually led to the sale of capital assets. He also hired an attorney to help him dispose of the assets. We found that the fees for these services were capital expenditures. Similarly, in Ellis Banking Corp. v. Commissioner,688 F.2d 1376 (11th Cir. 1982), affg. in part and revg. in part a Memorandum Opinion of this Court, the taxpayer executed an agreement to acquire certain stock. Upon execution of the agreement, the taxpayer was entitled to inspect the acquiree's books and records, which were required to be satisfactory as a condition precedent to the stock acquisition. The taxpayer paid independent auditors to inspect the records to determine if they were satisfactory. The court found that the fees paid to the auditors were expenses of investigating a capital asset and thus were capital expenditures. In particular, it noted: [T]he expenses of investigating a capital investment are probably allocable to that investment and must therefore be capitalized.That the decision to make the investment *707 is not final at the time of the expenditure does not change the character of the investment[.] [Emphasis added.] Ellis Banking Corp. v. Commissioner,supra at 1382. There is little evidence in the record herein as to the nature of the services rendered by the Glicksberg law firm. Neither petitioner nor any member of the law firm testified on this issue. However, the parties have stipulated to a bill sent by the law firm to petitioner. This bill, which is reproduced in the findings of fact, states plainly that it was sent "Re: Sale of Paul Learner Stock," and "For legal services in connection with tax and business matters rendered in the sale of stock of Paul W. Learner." The plain language of the bill indicates that the legal services were incurred with respect to the disposition of stock, a capital asset. There is no evidence explaining, elaborating, or contradicting this language. Without additional evidence, we must conclude that the $25,000 legal fee was a capital expenditure. Accordingly, we find that petitioner may not deduct this amount as an ordinary or necessary expense under section 212. Instead, he must treat it as a capital expenditure.
*708 To reflect our disposition of the three foregoing issues, Decision will be entered under Rule 155.
Footnotes
*. This case was tried before Judge Cynthia Holcomb Hall who subsequently resigned from the Court. By order of the Chief Judge the case was reassigned to Judge Perry Shields↩ for disposition.
1. Flynn-Learner, a Hawaiian corporation, was a wholly-owned subsidiary of The Learner Company.↩
2. Also on April 13, 1976, petitioner sold his entire interest in The Learner Company and Learner Investment Company to Century Iron Co., Inc., a subsidiary of Hugo Neu and Sons, Inc.↩
3. The parties have not indicated why March 19, 1976, rather than April 13, 1976, the date on which petitioner purchased the stock, is relevant. However, since the experts for both parties used March 19, 1976 in their valuations, we will use the same date.↩
4. The parties agree to this figure. They calculate the period beginning on March 19, 1976, see supra,↩ n. 3, and ending with the termination of the lease on July 31, 1979. 5. Operating expenses were $1,318.58 monthly, and annual taxes, pro rated monthly, were $628.81. Thus, operating expenses equalled about 53 percent of gross income, while operating expenses plus taxes equalled about 55 percent of gross income.↩
6. We do not purport to address whether the transfer properly qualified under section 1031.↩
6a. Respondent apparently determined that Learner-Eureka, Inc. had sufficient earnings and profits from which to make a dividend distribution. See sections 301 and 316. As petitioners do not question this determination, they are deemed to have conceeded its correctness.↩
7. Measurement of floor space in a building on a net square foot basis equals approximately eighty percent of that building's gross square footage. Gross floor space measurements include such areas as building mechanisms, hallways, dead space, and the like.↩
8. Petitioner's expert's report lists the capitalization rate at 12.5 percent. However, the property was sold for $65,000 and yielded $825 net monthly rental. These figures indicate a 15.2 percent capitalization rate.↩
9. This assumes a 52.5 percent tax rate, as computed in one of the expert's reports.↩
10. Unless otherwise indicated, any reference to "Rules" shall be deemed to refer to the Tax Court Rules of Practice and Procedure.↩
11. Both parties disregarded the remaining life of the building at 619 Second Street as an influence on their valuations. This is appropriate for valuation purposes when property has an extended remaining useful life, such as 25 years, and is capitalized at a high rate, such as 10 percent.See, e.g., S. Levine, Compound Interest Calculations and Tables, Financial Analyst's Handbook I: Portfolio Management 999, Table 15 at 1032 (1975).↩
12. The record does not disclose what goods a Purity Store sells. However, the Fortuna property was sold to Food-Mart, which is a grocery business.↩
13. Respondent's expert used a figure of 12,941 gross square feet. Eighty percent of respondent's gross figure is 10,353 square feet. ↩
14. With respect to a lease, landlords desire maximum space measurements, while tenants desire minimum measurements.↩
15. Annual net rent of $41,191 divided by a twelve percent capitalization rate yields the fair market value.↩
16. It is unclear from the record when Mr. Rynecki made repairs on the building. ↩
17. Of course, the cost of the actual repairs when made were capital expenditures to be added to the basis of the property.↩
18. Subsequent events may be used to corroborate evidence establishing value on the basic date. St. Paul Steam Laundry v. Commissioner,6 B.T.A. 529, 531↩ (1927).
19. "The larger n↩ is the surer we are of eliminating random noise from our estimate." E. Elton, M. Gruber, Time Series Analysis, Financial Analyst's Handbook I: Methods, Theory and Portfolio Management, ch. 39 at 1085 (1975). 20. Respondent's expert evidently had no theory for why these ratios should be related. He claimed that he found them by analyzing key measurements to find "if any of these [key measurements] in relation to the price formed an appraisal pattern." However, comparing ratios until one finds some which appear to be related is not a recognized method of making quantitative comparisons. In particular: The analyst should be careful to make his regression studies on variables which are related to each other. In other words, he should specify his model beforehand; not simply investigate a large number of series and make his model from the series which appear to have the closest fit. Spurious "correlation" studies are frequent. For example, one might note that the decade of the 1960s was a decade of great growth in both the number of security analysts employed and in the number of auto thefts. It would be possible to come up with a fairly closely fitting regression equation indicating that auto thefts rose directly in line with the number of security analysts employed. The basic fallacy, of course, is that the two series are completely unrelated.Both series are reacting to other forces--it is just a coincidence that both were in a strong uptrend at the same time. In all types of analysis it is possible to be misled if one examines a large number of series. Often-times, the closest fit is obtained by use of factors which are not primarily related. However, the accident of close fit does not make the theory sound. * * * R. Milne, Regression Analysis, supra↩ n. 19 at 1065.
21. The report assumed that the relationship between the chosen ratios was linear and could be described by the equation Y = aX + b. In particular, Y equalled price/book value and X equalled weighted average earnings book/value. Thus, the bottom half of each ratio, or "book value" may be eliminated. (Book value could not be factored out if respondent's expert had assumed that the ratios shared a non-linear relation.) ↩
22. See, e.g., S. Pratt, Valuing a Business: The Analysis and Apprisal of Closely-Held Companies 60-66 (1981). ↩
23. See S. Pratt, Valuing a Business, supra↩ n. 22, 31-32.